UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JACQUELINE SMITH, individually and as next friend of the Estate of Danarian Hawkins, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:15-cv-2226 |
| HARRIS COUNTY, TEXAS, | § § § | |
| Defendant. | § | JURY DEMANDED |

**SECOND AMENDED COMPLAINT**

Plaintiff Jacqueline Smith brings this lawsuit against Harris County, Texas seeking redress for the preventable death of her beloved son, Danarian Hawkins. Defendant excluded Danarian from and denied him participation in its services, programs, and activities, and discriminated against Danarian because of his disability by housing him in conditions that endangered him, including a solitary cell with an obvious tie-off point and a hanging implement, while refusing to carefully monitor him, provide him family visitation, or equip its staff with training, polices, or procedures to make any of these reasonable accommodations, allowing him to hang and die in his cell, and thereby violating the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. §794, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §12131, *et seq*. Ms. Smith brings these claims, both as next friend to Danarian's estate for Danarian's injuries and on her own behalf as a statutory beneficiary of the Texas Wrongful Death Act, and would show the following:

JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, and §2201.

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as the events complained of occurred in this district and division.

PARTIES

3. Jacqueline Smith, also known as Jacqueline Nelson, is Danarian Hawkins' mother. Ms. Smith brings this suit on her own behalf and as next friend of Danarian's estate.

4. Defendant Harris County, Texas is a political subdivision of the State of Texas. At all relevant times, it operated the Harris County Jail, a public facility with programs and services for which Danarian Hawkins was otherwise qualified, and by its own admission and insistence, is liable and responsible for the actions of the Harris County Sheriff in an official capacity in operation of the jail. Harris County is a recipient of federal funds. Harris County is sued for compensatory and equitable relief under federal law and can be served through its counsel of record, Mr. Fred Keys and Ms. Laura Hedge, via the CM/ECF system for the Southern District of Texas.

STATEMENT OF FACTS

5. As a young boy, Danarian was a ray of sunshine in his mother Jacqueline Smith's life. Danarian was creative; he liked to draw, write songs, and sing. Above all, he loved to make his family and friends laugh, and he was very good at it. Even though he was always "a little different" from the other kids, Ms. Smith remembers Danarian as an outgoing and well-liked child who was always trying to be a helpful, good son.

6. Unfortunately, diagnosed paranoid schizophrenia and bipolar disorder began to attack Danarian's mind around the time he turned 15 years old. Though he had been a good student, his grades started slipping and he started acting out at school and at home. When his father passed away a couple years later, his behavioral and mental health problems intensified. However, even in his adult years, the old Danarian frequently shined through, making his friends and family laugh just like he used to; but increasingly, his emerging mental disabilities interfered with his ability to perform major life activities, including communicating, concentrating, working, understanding, and, ultimately, living.

7. Paranoid schizophrenia is a serious mental disability. Recognizable symptoms of schizophrenia typically manifest between the late teen years and early twenties. The earliest symptoms of schizophrenia are difficult to diagnose in the turbulent teenage years because they may appear to be only slightly more severe than typical teen misbehavior and angst. However, as time passes, the signs and symptoms of schizophrenia become far more pronounced and debilitating. Such symptoms may include paranoid delusions, hallucinations, and disordered thinking and speech. The damage that schizophrenia can do even to previously high-functioning individuals is well-documented and widely-recognized, including in movies such as *A Beautiful Mind.*

8. While at home, Danarian's mental disorders sadly manifested themselves in physical acts and delusional thoughts. He suffered from chronic insomnia and depression. He sometimes became convinced that his mother could read his thoughts. Once, Danarian dazedly wandered into a neighbor's home unannounced and inexplicably sat down to watch television. Incidents like this began to land him in the custody of Harris County Jail from time to time in his late teenage years and early twenties. As a result, Defendant Harris County and its staff had experience with and records documenting Danarian's mental disabilities for nearly a decade's time.

9. In spite of his disabilities, Danarian strived to work, lead, and live a normal life. He loved to work and often had a job. He asked his mom to take him to job interviews, and on the nights before he had an interview, he prepared himself, meticulously ironing his clothes and laying them out for the morning. With the money he earned, Danarian took pride in helping to support his mother; Ms. Smith remembers that Danarian routinely gave her a hundred dollars a week to help with her expenses, in addition to chipping in for groceries and whatever else he could. Above all, Ms. Smith cherished the love that Danarian showed her on a daily basis. He always made sure she knew how much he loved her.

10. But Danarian's mental disabilities intensified as he got older. He began exhibiting auditory hallucinations. Most frighteningly, at one of his lowest points, Danarian attempted to commit suicide. Although she did not have a staff of mental health treatment professionals and round-the-clock guards, Ms. Smith monitored Danarian, provided him with medical care, and interceded before he could seriously hurt himself.

11. By the age of 25, Danarian's mind forced him to display obvious signs of his mental disabilities. In May 2012, while in Harris County's custody on charges of criminal mischief and misdemeanor theft, physicians documented that Danarian suffered from schizoaffective disorder, auditory hallucinations, and delusions.

12. Over the past five years, while in Harris County's custody, Danarian was prescribed medications to treat schizophrenia, bipolar disorder, and depression; namely, chlorpromazine, olanzapine, divalproex, and sertraline. Harris County did not have to guess Danarian's disabilities – it witnessed, diagnosed, and recognized the severity of Danarian's mental illnesses by administering anti-psychotic medications, temporarily sending him to outside health care providers, and designating him a suicide risk. Doctors warned Defendant that the dangers Danarian posed to himself required accommodations for his safety.

13. Defendant's employees also bore witness that Danarian had trouble concentrating during conversations, sometimes spoke incoherently, and became upset when others could not understand him. Jailers saw that Danarian often did not believe he had a mental disability, refused hospitalization, and refused to take his medication, which required Defendant to take notice and monitor very carefully to ensure he regularly took and did not tamper with his prescriptions.

14. Because it incarcerates people and controls every aspect of their lives, Harris County has a responsibility to accommodate people with disabilities even if they or their family members do not make requests. This duty is especially clear for Harris County with regard to people with mental

disabilities and particularly important for people at risk of suicide. Harris County is required to train its staff to identify people who are at risk of killing themselves, monitor them frequently and closely, and ensure it does not house them alone and provide them with an object with which they can hang themselves, or in a cell that contains an obvious ligature (tie-off) point for hanging. Harris County knows that hanging is by far the most common form of suicide for jail inmates.

15. In July of 2012, Danarian ended up in Harris County Jail accused of robbery after allegedly displaying a toy gun in a parking lot and asking for money. Incarceration dramatically increased his compulsion to end his own life. During the last eighteen months of his life, as he awaited trial, Danarian warned Harris County's guards that he heard voices and wanted to kill himself on at least five documented occasions, and he attempted to hang himself at the jail on at least three occasions. Records dating back to 2010 show at least eight instances in which Danarian spoke of hearing voices to harm himself and at least six attempts at suicide at the jail – including five attempts to hang himself with ligatures using the jail's tie-off points.

16. Danarian's mental disability and its resulting limitations – including the compulsion to end his life while incarcerated – and the corresponding necessary accommodations of careful monitoring and avoidance of solitary cells with ligature points and hanging implements were open, obvious, and apparent to Defendant. Harris County Jail staff actually witnessed Danarian attempting to take his life by hanging nearly a half-dozen times, and by hoarding his prescribed medication for weeks and consuming it all at once on at least one occasion.

17. Nevertheless, Defendant would sometimes place Danarian in a solitary cell because of the words and actions caused by his mental disability. Harris County Jail has a serious overcrowding problem and does not house most of its prisoners who do not have mental disabilities by themselves. But Defendant knowingly put Danarian in solitary cells on multiple occasions because of his mental health and refusal to properly accommodate it.

18. In April 2013, Harris County confined Danarian in a cell by himself on Block 2J2 that contained a smoke detector and provided him with a bed sheet – in combination, well-known implements for hanging. Predictably, just as he had done in Defendant's custody numerous times before, Danarian started to hang himself in the cell on Block 2J2, but guards luckily intervened before a serious tragedy occurred.

19. In July 2013, jailers found Danarian unresponsive in his cell, completely covered in vomit and urine. Harris County had failed to carefully monitor him or ensure he regularly took his prescribed medications, so Danarian had hoarded his pills over a period of weeks and attempted to take them all at once. Once again, Defendant was on notice that Danarian posed a very real threat to commit suicide if not monitored very closely.

20. Danarian's family repeatedly contacted Defendant and requested that it house him safely in a manner in which he was closely monitored. Ms. Smith and other family members wrote letters to Harris County officials – including then-Harris County Sheriff Adrian Garcia and Judge Michael T. McSpadden – begging for accommodations to prevent Danarian's suicide. They filed inmate care concerns and personally pled with Defendant's staff and nurses to follow through on requests for accommodation to monitor Danarian closely, provide him with needed services, and, above all, prevent him from committing suicide. The family stressed to Defendant that Danarian's father, who also suffered from paranoid schizophrenia, had committed suicide. Danarian's mother attempted to visit Danarian to raise his spirits and help keep him mentally healthy. On more than one occasion, she and her son both made requests for accommodations to allow her to visit, but Harris County Jail staff denied these benefits and excluded Danarian from the visitation program in a counterintuitive effort to punish him deliberately and because of his mental disability for attempting to commit suicide. Meanwhile, non-disabled prisoners are not similarly punished for impulsive actions stemming from their mental disabilities and are not therefore denied the benefits

of Defendant's visitation program because of their disabilities.

21. Despite these obvious warnings from Danarian and pleas from his family to Defendant, it excluded Danarian from participation in and benefits of its programs and services by refusing to place Danarian in safe housing equipped to accommodate his serious mental disabilities; carefully monitor him; keep him out of solitary cells; withhold implements of suicide from him; or allow him access to the visitation program. Instead, Harris County routinely ignored, denied, or refused the reasonable needs and requests for accommodation of Danarian and his family's requests for accommodation, as if it were unaware of his mental disabilities and needs.

22. Defendant has not modified and does not adequately equip its staff with the information, training, policies, or procedures necessary to accommodate the needs of inmates like Danarian who have mental disabilities that put them at risk of suicide, thereby excluding them from equal participation in and denying them the benefits of Defendant's programs and the protections afforded to prisoners who do not have disabilities. Instead, Harris County leaves its jail employees dangerously ignorant of and indifferent to their duties. For example, in early February 2014, Danarian told at least one of guard at the jail that he intended to commit suicide. As that guard later said, "a lot of guys say they will kill themselves all the time, and we didn't think that [Danarian] was serious."

23. Finally, on February 5, 2014, despite the extremely imminent risk of suicide, Harris County knowingly and intentionally placed Danarian alone in a cell on Block 2J2. Housing prisoners with known suicidal tendencies alone is dangerous, as people are less likely to take their own lives when there are other people around them. Suicide attempts are frequently impulsive and can be stopped by the presence of another person – even a cellmate – or guards that make proper monitoring checks. Nevertheless, Harris County and its staff segregated him to a solitary cell and failed to closely or frequently monitor Danarian, who suffered from delusions and suicidal ideations.

In doing so, Defendant again denied him eminently reasonable accommodations that could have saved his life. Each of Defendant's refusals to accommodate Danarian's serious mental illnesses were intentional discrimination solely based on his disabilities. Tragically yet unsurprisingly, as a direct consequence of Defendant's failure to accommodate him, guards found Danarian dead on Block 2J2 that day – hanging from Harris County's bedsheet and using Harris County's smoke detector as the ligature point.

24. Defendant intentionally housed Danarian in a cell with known tie-off points from which a ligature could be hung – such as the smoke alarm he had nearly successfully hung his bedsheet from in the past. Although Defendant knew Danarian had attempted to use architectural features of his cell, like smoke alarms, to complete a suicide, Harris County took no action to house him safely in a cell without tie-off points.

25. Defendant has failed to prevent many hanging deaths of inmates with serious mental disabilities prior to Danarian. Despite incarcerating many inmates like Danarian with known severe mental disabilities that limit cognitive faculties, Harris County consistently and intentionally refuses to equip staff to handle and protect them, monitor them carefully, house them safely, ensure they take prescribed medicine, or withhold implements of suicide from them such that they can live life in Harris County Jail as safely and effectively as non-disabled prisoners. Indeed, in the two months after Defendant refused to accommodate Danarian's disabilities, they allowed James Earl Bishop and Ethen Drake to hang themselves to death in their cells at the Harris County Jail. Like Danarian, Harris County had Ethen Drake had on suicide watch at the time.

CAUSES OF ACTION

26. Harris County, at all relevant times, was a recipient of federal funds, and thus covered by the mandates of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal funds to reasonably accommodate persons with mental disabilities in their facilities, programs,

activities, and services, and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. §794.

27. Title II of the ADA also applies to Harris County, Texas, and has the same mandate as the Rehabilitation Act. 42 U.S.C. §12132.

28. The Harris County Jail is a facility, and its operations comprise programs, services, and benefits for purposes of the Rehabilitation Act and the ADA.

29. Danarian's diagnoses of mental illnesses predate the events described in this complaint. Thus, he was a qualified person with a disability protected by the ADA and a handicapped individual protected by the Rehabilitation Act. Defendant incarcerated Danarian and knew of his serious mental disabilities, so he was a "qualified individual" for the purposes of both statutes.

30. Defendant's employees reviewed Danarian's personal and medical history. Since Defendant knew that both bipolar disorder and schizophrenia are debilitating mental illnesses that limit major life activities such as thought, survival, and sleep, they also knew Danarian needed reasonable accommodations. Communications from Danarian's family also notified Harris County that Danarian suffered from bipolar disorder and schizophrenia, needed psychiatric medication, safe housing, careful monitoring, and intensive suicide prevention measures.

31. Danarian previously attempted to commit suicide while in Defendant's custody, and Defendant knew he presented a serious and obvious risk of suicide. Harris County documented at least six suicide attempts – five by hanging – including when Danarian tried to hang himself in a solitary cell in the same block where Defendant later placed him alone and allowed him to die by the exact same method – using a bed sheet tied to a smoke detector. Psychiatrists, Ms. Smith, family members, and Danarian himself all warned Harris County of Danarian's severe risk of suicide as a result of his mental disability and requested reasonable modifications and measures that could have prevented Danarian's death if Defendant had only accommodated these requests.

32. Despite this clear knowledge, Defendant excluded Danarian from and denied him participation in its services, programs, and activities, and discriminated against Danarian because of his disability by housing him in conditions that endangered him, including a solitary cell with an obvious tie-off point and a hanging implement, while refusing to carefully monitor him, provide him family visitation, or equip its staff with training, polices, or procedures to make any of these reasonable accommodations. Doing so would not have been an undue burden for Defendant; in fact, it already maintains the proper resources and has an affirmative obligation to do so. These failures and refusals resulted from Defendant's intentional decisions not to accommodate Danarian's known disability-related needs and ultimately caused Danarian's death. These failures and refusals constitute discrimination solely by reason of disability, under the meaning of the ADA and Rehabilitation Act, because Defendant failed to accommodate Danarian to allow him equal access to and the benefits of programs and services in Harris County Jail. To be clear, Ms. Smith does not bring any claim for inadequate medical care or treatment. Because Harris County's acts of intentional discrimination against Danarian are violations of the Rehabilitation Act and ADA and directly resulted in Danarian's death, Ms. Smith is entitled to recover, directly and as representative of Danarian's estate, for those damages he sustained as described in this complaint.

33. Thus, as alleged above, Defendant failed and refused to reasonably accommodate Danarian's known disability-related needs while in Defendant's custody, in violation of the ADA and Rehabilitation Act, thereby causing his death.

34. Ms. Smith brings these claims on behalf of herself and her son's estate under the Texas Survival Statute and the Texas Wrongful Death Act, which are incorporated for standing purposes into the Americans with Disabilities Act. 42 U.S.C. §12133; TEX. CIV. PRAC. & REM. CODE §§71.002, 71.004, 71.021; *see generally Ass' n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).

## JURY DEMAND

35. Plaintiff respectfully requests a trial by jury.

## RELIEF REQUESTED

36. The actions and omissions of Defendant, its agents, employees, and representatives, proximately caused and were the moving force behind the injuries and damages leading to and arising from the death of Danarian Hawkins, including damages to which Ms. Smith is entitled individually as well as those to which she is entitled on behalf of Danarian's estate. Ms. Smith asserts claims on behalf of Danarian's estate under the Rehabilitation Act and the Americans with Disabilities Act. Ms. Smith also asserts claims on her own behalf pursuant to the standing provisions of the Americans with Disabilities Act.

37. Ms. Smith and Danarian's estate are entitled to compensatory, presumed, and nominal damages against Defendants in the maximum amounts allowed by law. Ms. Smith asserts claims on behalf of the estate for damages including, but not limited to, past physical pain and suffering, past mental anguish, and funeral and burial expenses. In her individual capacity, Plaintiff asserts claims including, but not limited to, past physical pain and suffering, past mental anguish, loss of past and future earnings, past and future loss of companionship, society, services, support, and affection of her son.

38. Plaintiff is entitled to equitable relief, such as a declaration regarding Defendant's violations under the law regarding the denial and exclusion of prisoners with mental disabilities from its programs and services, which includes measures to prevent Defendant's refusal to reasonably modify its policies and procedures or train its staff to accommodate prisoners with disabilities at risk of suicide by failing to closely and frequently to monitor them or safely house them in solitary cells that do not contain ligature points or the tools to kill themselves.

39. Ms. Smith also requests attorneys' fees, costs, and expenses against Defendant for the Rehabilitation Act and ADA claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a(b).

PRAYER FOR RELIEF

THEREFORE, Plaintiff respectfully requests that the Court:

A. Award compensatory and nominal damages against Defendant for violations the Rehabilitation Act and the ADA as appropriate;

B. Issue equitable relief for the unlawful actions, inactions, programs, facilities, services, policies, training, and practices of Defendant that violate the ADA and Rehabilitation Act;

C. Find that Ms. Smith is the prevailing party in this case and award her all appropriate attorneys' fees, court costs, expert costs, and litigation expenses; and

D. Grant all other relief to which Plaintiff may be entitled.

Dated:  December 14, 2015.

Respectfully Submitted,

 /s/ Amin Alehashem
Amin Alehashem
Texas Bar No. 24073832
S. Dist. No. 1134538
Wallis Nader
Texas Bar No. 24092884
S. Dist. No. 24092884
James C. Harrington
S. Dist. No. 4025
State Bar No. 09048500
Wayne Krause Yang
Texas Bar No. 24032644
S. Dist. No. 31053

TEXAS CIVIL RIGHTS PROJECT – HOUSTON
2006 Wheeler Ave.
Houston, Texas 77004
   (832) 767-3650 (phone)
   (832) 554-9981 (fax)

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2015, Plaintiff's Second Amended Complaint was filed on the Southern District's CM/ECF system, which will send notification to Defendants' counsel of record: Mr. Fred A. Keys, Jr., and Ms. Laura Beckman Hedge, Harris County Attorney's Office, 1019 Congress, 15th Floor, Houston, Texas 77002.