```
                   IN THE UNITED STATES DISTRICT
                  COURT SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

JACQUELINE SMITH,              )
Independent Administrator      )
of the Estate of               )
Danarian Hawkins, Deceased     )
                               )
          PLAINTIFF,            )   CAUSE OF ACTION NO.
                               )      4:15-cv-2226
v.                             )
                               )
                               )
HARRIS COUNTY                  )
          DEFENDANT,            )
```

---

ORAL AND VIDEOTAPED DEPOSITION OF

SERGEANT STEVEN WILSON

May 24, 2017

---

ORAL AND VIDEOTAPED DEPOSITION OF SERGEANT STEVEN WILSON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 24th of May, 2017, from 10:09 a.m. to 3:33 p.m., before Keith McCabe, CSR in and for the State of Texas, reported by machine shorthand, at the Harris County Attorney's Office, 1019 Congress Street, Meeting Room 111, Houston, Texas, 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

1   A.   I've had tons of training.  So I'm sorry.  I
2   can't --
3   Q.   I understand.  You are required to do some
4   ongoing training for your peace officer certification; is
5   that right?
6   A.   Yes.
7   Q.   And so that training is through TCOLE, correct?
8   A.   It reports to TCOLE.
9   Q.   So it would be on your TCOLE training record,
10  correct?
11  A.   Yes, ma'am.
12  Q.   Okay.  Did you receive training on suicide
13  detection and prevention in jails?
14  A.   Yes.
15  Q.   Do you remember when that was?
16  A.   No, ma'am.
17  Q.   Was it once?
18  A.   I don't recall.
19  Q.   Could it have been more than once?
20  A.   Possibly.
21  Q.   Do you recall when was the last time you might
22  have received that training?
23  A.   No, ma'am.
24  Q.   Okay.  Do you recall if that was an in-person
25  training?

```
 1        A.    I don't recall.
 2        Q.    Okay.  Do you remember if as part of that
 3   training you learned about different mental illnesses that
 4   inmates can have?
 5        A.    I guess I'm not following you.  I don't recall
 6   exactly how the training went; so --
 7        Q.    Do you recall anything about the content of that
 8   training?
 9        A.    Suicide prevention.
10        Q.    Let me ask you some details, and if you don't
11   remember them, you can just tell me you don't remember
12   them.  Do you remember learning about bipolar disorder?
13        A.    Yes.
14        Q.    Do you remember learning about symptoms of
15   bipolar disorder?
16        A.    Yes.
17        Q.    Do you remember learning about psychosis?
18        A.    Yes.
19        Q.    Do you remember learning about symptoms of
20   psychosis?
21        A.    Yes.
22        Q.    Do you remember learning about major depression?
23        A.    Yes.
24        Q.    Symptoms of major depression?
25        A.    Yes.
```

1    Q.    Schizophrenia?

2    A.    Yes.

3    Q.    Symptoms of schizophrenia?

4    A.    Yes.

5    Q.    So it's fair to say you learned about a number of

6    mental illnesses that inmates could have?

7    A.    For anybody, yes.

8    Q.    And there were some components of that training

9    that was about the role of correctional officers in

10   preventing suicide in jails, correct?

11   A.    I don't recall.

12   Q.    Okay. Do you recall anything about how to handle

13   an inmate who is found hanging?

14   A.    No.

15   Q.    How about how to respond to an inmate who has

16   tried to kill himself by overdosing?

17   A.    I guess I'm -- even the question before I'm

18   having trouble with. You're asking for a very -- a

19   specific response to a generalized situation. So there

20   are options available, but there is no one right way to

21   respond to that.

22   Q.    In general, that you were trained on responding

23   to suicides if you encounter them --

24   A.    Yes.

25   Q.    -- right?

1        Okay.  And in general, you were trained on
2  methods of suicide prevention in jail, correct?
3       A.   Yes.
4       Q.   Okay.  And the goal of that training also
5  included detecting suicide risk in particular inmates,
6  correct?
7            MS. HEDGE:  Objection; calls for speculation.
8       A.   I'm not following you.
9       Q.   (BY MS. NATARAJAN)  So you learned also about how
10 to detect suicide risk in inmates; correct?
11           MS. HEDGE:  Objection; calls for speculation
12 and vague.
13      A.   Again, that's a vague question.  I don't know how
14 to answer that.
15      Q.   (BY MS. NATARAJAN)  So you don't recall, for
16 example, learning that correctional officers can help
17 figure out if someone is at higher risk of suicide than
18 other inmates?
19           MS. HEDGE:  Objection; calls for speculation,
20 calls for information that would be expert opinion or
21 knowledge.  This witness has not been established to be an
22 expert in that area.
23      A.   I don't know how to answer that.
24      Q.   (BY MS. NATARAJAN)  So you don't recall being
25 trained about that?

```
 1                MS. HEDGE:  Object -- same objections.
 2        A.   I'm not following you; so I don't know how to
 3   answer that.
 4        Q.   (BY MS. NATARAJAN)  Okay.  You do remember being
 5   trained about methods of suicide prevention.  You said
 6   that, correct?
 7        A.   Yes.
 8        Q.   And part of preventing suicide includes figuring
 9   out who is suicidal in the jail, correct?
10                MS. HEDGE:  Objection; calls for speculation,
11   assumes facts not in evidence, and no proper foundation or
12   predicate has been laid.
13        A.   I can't answer that question.
14        Q.   (BY MS. NATARAJAN)  You were trained on
15   responding to suicides properly, correct?
16        A.   Yes.
17        Q.   And that training included the importance of CPR
18   and first aid, correct?
19        A.   Yes.
20        Q.   When you were a sergeant at the jail, did you
21   receive any instruction with regard to suicide prevention?
22                MS. HEDGE:  Objection; vague.
23        A.   Instruction as -- I'm not following you again.
24        Q.   (BY MS. NATARAJAN)  You received instruction
25   sometimes from your supervisors, correct?
```

1    Q.   Okay. So according to this report, it sounds
2 like you heard a floor page requesting rovers for a
3 medical emergency in 2J2, correct?
4    A.   Yes.
5    Q.   Do you have an independent memory of that?
6    A.   The actual page itself?
7    Q.   Yeah.
8    A.   No.
9    Q.   Okay. Do you have an independent memory of
10 arriving on the scene, however?
11   A.   Yes.
12   Q.   And what did you do when you arrived on the
13 scene?
14   A.   I responded to the location where I was being
15 directed to.
16   Q.   Okay. And it sound like -- sounds like you got
17 there and you found an inmate by the name of Carl Simmons
18 who was outside his cell who said that he was helping out,
19 correct?
20   A.   Yes.
21   Q.   And so it looks like you ordered inmate Simmons
22 to go back to his cell, and he immediately complied,
23 correct?
24   A.   Yes.
25   Q.   Do you have an independent memory of this inmate

```
 1   named Simmons helping out with this incident?
 2        A.   No.
 3        Q.   You didn't witness him helping out in any way,
 4   right?
 5        A.   No.
 6        Q.   By the time you got there, he was just standing
 7   there?
 8        A.   Yes.
 9        Q.   And you ordered him to get back into his cell,
10   and you locked the cell door?
11        A.   Yes.
12        Q.   Okay.
13        A.   Well, he locked his own cell door.  He closed it.
14        Q.   Okay.  Okay.  It says next that you saw inside
15   the cell, and by this I think you meant Mr. Hawkins's
16   cell, Officer Cano beginning chest compressions on inmate
17   Danarian Hawkins.
18        A.   Yes.
19        Q.   Do you see where it says that?
20             Do you remember where Mr. Hawkins was placed
21   at the time?
22        A.   He was on the bunk bed -- or the bed.
23        Q.   Okay.  And it says Officer Cano was beginning
24   chest compressions, and you saw a white sheet tied around
25   Hawkins's neck; is that right?
```

1    A.   Yes.

2    Q.   And he was unresponsive, and there was foam

3    around his mouth, correct?

4    A.   Yes.

5    Q.   And it looks like you tried to loosen the sheet

6    around his neck; is that correct?

7    A.   No.

8    Q.   Okay.  I'm going to read to you where it says, "I

9    was able to loosen the sheet around inmate Hawkins's neck,

10   but the knots could not be broken."

11   A.   Yes.

12   Q.   So do you have any independent recollection of

13   that apart from what's in this report?

14   A.   Yes.

15   Q.   Okay.  What do you remember about that?

16   A.   I remember loosening the knot.  It was already

17   loose, but I wanted to try to get it looser and if not

18   remove it to secure the knot.  So I did my best to -- to

19   do it, but I wasn't able to completely untie the knot.

20   Q.   Can you just explain to me what it means when you

21   say, "I was able to loosen the sheets but not the

22   knots" -- or "not break the knots."  What does that mean?

23   A.   Well, the knots were tied too tight where I

24   couldn't get them undone without focusing completely on

25   the knots.  Priority number one at that point in time is

1   CPR and revival of the inmate.
2       Q.   And so how are you able to loosen the sheet if
3   you couldn't get the knots undone?
4       A.   As I -- as I pulled it together, I was able to
5   loosen up and get a hand underneath it where it was no
6   longer restrictive.  And then at that point in time, I
7   didn't worry about it anymore.
8       Q.   Okay.  So when you got there, the knot was still
9   so tight that it was restrictive?
10      A.   No.  It was still loose.  I tried to loosen it
11  more.
12      Q.   I see.  Okay.
13           And you were able to get a couple of your
14  fingers underneath that knot after you loosened it?
15      A.   Yes.
16      Q.   Okay.  And that whole time Officer Cano was
17  concentrating on chest compressions?
18      A.   Correct.
19      Q.   Can you just show me, using your hands, what it
20  looks like when you're performing chest compressions?
21      A.   You want to see what --
22      Q.   Just pretend, you know, that there's a body in
23  front of you.  Is it -- do you have your hands here?  Do
24  you need one hand and one hand does something -- what --
25  what are you supposed to do?

1   Q.  Okay. So he went to go get that. How does it
2   help CPR?
3   A.  I'm not a person on that. It is a box where
4   you -- you follow the instructions, and it tells you
5   exactly what to do step by step.
6   Q.  In order to do CPR?
7   A.  Or to administer shock or perform CPR.
8   Q.  Okay. And then it says DO Thompson was ordered
9   to retrieve the cut-down tool from the pod control center
10  in order to remove the and secure the knot in the sheet.
11         Do you see where it says that?
12  A.  Yes.
13  Q.  And it says the other detentions officers were
14  staged for relief in chest compressions.
15  A.  Yes.
16  Q.  What does that mean, "staged for relief in chest
17  compressions"?
18  A.  That means as soon as one gets tired, the next
19  one can fall in without any lapse in time.
20  Q.  Perfect. Okay.
21         And where it says Officer Thompson was
22  ordered to retrieve the cut-down tool -- now the cut-down
23  tool is something like a knife with a hook on it; is that
24  right?
25  A.  It's been a while since I've seen it, but, yes.

1     Q.   Okay.  And a cut-down tool is kept in jails so
2  that if someone is hanging, then you can quickly cut them
3  down; is that right?
4     A.   It's -- it's staged in certain spots in the jail,
5  yes.
6     Q.   Okay.  And the staging is for -- basically for
7  rescue, right?  That's what the cut-down tool is for?
8     A.   General purpose, yes.
9     Q.   Okay.  And where was the cut-down tool kept?  It
10 says -- the reason I ask is it says, "He was ordered to
11 retrieve the cut-down tool from the pod control center."
12 Is that where it was kept?
13    A.   Yes, ma'am.
14    Q.   Okay.  And where was it kept in the pod control
15 center?
16    A.   In that particular pod, I don't recall.
17    Q.   Is there other pods, is there a place where it's
18 usually kept?
19    A.   Yeah.  There's usually a designated spot.  It's a
20 red box, but each pod had a little different spot
21 depending on the layout.  So I don't recall the exact
22 location in that pod.
23    Q.   Is the box on the wall like a fire extinguisher
24 box?
25    A.   A fire extinguisher box?

| | |
|---|---|
| 1 | Q. You know the red boxes that have a fire |
| 2 | extinguisher, and then you crash it and you get the fire |
| 3 | extinguisher out or the fire -- |
| 4 | A. I haven't seen one of those in years. |
| 5 | Q. I'm old. But when you say a red box, was it |
| 6 | inside of sort of a tool-chest sized box? |
| 7 | A. Again -- again, it's been a while since I've |
| 8 | actually looked at it. It -- it was -- it was big enough |
| 9 | to house the device. |
| 10 | Q. Okay. And always kept in the pod control center? |
| 11 | A. In a locked secure area, yes. |
| 12 | Q. Okay. Now it says, "After numerous chest |
| 13 | compressions, I ordered Cano to stop CPR to check for a |
| 14 | pulse. After checking, I was unable to find a pulse, and |
| 15 | there was no sign of breathing." |
| 16 | So it looked like you tried to find his |
| 17 | pulse? |
| 18 | A. Yes. |
| 19 | Q. And you weren't able to find a pulse? |
| 20 | A. That is correct. |
| 21 | Q. And there was no sign of breathing? |
| 22 | A. That is correct. |
| 23 | Q. And at this time, Cano was continuing chest |
| 24 | compressions? |
| 25 | A. No. |

1   Q.   I'm reading from the -- from the report.  It says
2   right after it says, "There was no sign of breathing.  DO
3   Cano was ordered to continue chest compressions."
4   A.   Okay.  Yes.
5   Q.   Okay.  And then Lawson arrived with the AED to --
6   and then tried to activate the device?
7   A.   Yes.
8   Q.   And it looks like the next thing that happened is
9   that medical personnel arrived on-scene.  Do you remember
10  that?
11  A.   Yes.
12  Q.   Do you remember that independently of this
13  report?
14  A.   Yes.
15  Q.   So are we talking about medical personnel from
16  the jail?
17  A.   Yes.
18  Q.   And do you remember who exactly the personnel
19  was?
20  A.   Who exactly, no, ma'am.
21  Q.   Was it nurses from the jail?
22  A.   Yes.
23  Q.   And were there two of them?
24  A.   I believe so, but I don't remember an exact
25  count.

1    Q.   Did they arrive with any equipment?
2    A.   They had a stretcher.  I don't recall anything
3　else.
4    Q.   Okay.  And it says that medical personnel arrived
5　on-scene and took over before the AED could be
6　administered.
7         Do you see that?
8    A.   Yes.
9    Q.   Do you remember that independently?
10   A.   Yes.
11   Q.   And do you remember what the medical personnel
12　did at that time?
13   A.   They ordered us -- they ordered us to take inmate
14　Hawkins out of the cell, carry him downstairs with the
15　gurney so they can get him down to the clinic as soon as
16　possible.
17   Q.   And then did you see them take him down to the
18　clinic?
19   A.   No.
20   Q.   Okay.  According to your report, Cano, Lawson,
21　and you carried inmate Hawkins down the stairs and placed
22　him on the gurney.
23   A.   Yes.
24   Q.   Do you remember from your own memory of doing
25　that?

1   A.   Yes.

2   Q.   And how did you guys carry him?

3   A.   I believe we had one on each arm, and one of us
4   had the legs.  I don't recall who had what position.

5   Q.   Okay.  And then you put him on the gurney -- the
6   three of you put him on the gurney?

7   A.   Yes.

8   Q.   And then as soon as you put him on the gurney,
9   did the medical personnel take him down to the clinic?

10  A.   Yes.

11  Q.   All right.  And it says, "After that, I remained
12  briefly in the cell block and ensured that the screen was
13  secured."

14       Do you see that?

15  A.   Yes.

16  Q.   And then after that you proceeded to the clinic;
17  is that right?

18  A.   Correct.

19  Q.   So when you got to the clinic, do you have any
20  independent memory of getting to the clinic and watching
21  what happened at the clinic?

22  A.   They -- when I got there, they were -- the entire
23  clinic staff doctors were all working on inmate Hawkins.

24  Q.   And -- they were trying to see if they could
25  revive him, right?

```
 1              THE WITNESS:  All right.  It's mine.  Okay.
 2                         EXAMINATION
 3    BY MS. HEDGE:
 4         Q.    You were asked some questions earlier about
 5    cut-down tool.  Do you recall that?
 6         A.    Yes.
 7         Q.    And you had ordered detention officer to go
 8    retrieve the cut-down tool after Mr. Hawkins had already
 9    been removed from hanging in his cell; is that correct?
10         A.    Yes.
11         Q.    Did Mr. -- did Detention Officer Thompson, in
12    fact, return with the cut-down tool?
13         A.    Yes.
14         Q.    What was the time period in which he returned
15    with the cut-down tool?
16         A.    It was after inmate Hawkins had been taken -- put
17    on the stretcher and taken by medical.  They performed the
18    CPR to take him down to the clinic for additional
19    treatment.
20         Q.    Did you order detention officer to then go down
21    to the medical clinic?
22         A.    No.
23         Q.    You testified earlier that you then secured the
24    scene before you went down to the medical clinic; is that
25    correct?
```

```
 1              IN THE UNITED STATES DISTRICT
              COURT SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3  JACQUELINE SMITH,             )
    Independent Administrator     )
 4  of the Estate of              )
    Danarian Hawkins, Deceased    )
 5                                )
              PLAINTIFF,          )  CAUSE OF ACTION NO.
 6                                )        4:15-cv-2226
    v.                            )
 7                                )
                                  )
 8  HARRIS COUNTY                 )
              DEFENDANT,          )
 9

10

11
                    REPORTER'S CERTIFICATION
12          DEPOSITION OF SERGEANT STEVEN WILSON
                        May 24, 2017
13

14

15

16        I, Keith McCabe, Certified Shorthand Reporter in

17  and for the State of Texas, hereby certify to the

18  following:

19        That the witness, SERGEANT STEVEN WILSON, was

20  duly sworn by the officer and that the transcript of the

21  oral deposition is a true record of the testimony given by

22  the witness;

23        I further certify that pursuant to FRCP Rule

24  30(f)(1) that the signature of the deponent:

25        ____ was requested by the deponent or a party
```

| | |
|---|---|
| 1 | before the completion of the deposition and returned |
| 2 | within 30 days from date of receipt of the transcript. If |
| 3 | returned, the attached Changes and Signature Page contains |
| 4 | any changes and the reasons therefor; |
| 5 | __X__ was not requested by the deponent or a |
| 6 | party before the completion of the deposition. |
| 7 | I further certify that I am neither attorney nor |
| 8 | counsel for, related to, nor employed by any of the |
| 9 | parties to the action in which this testimony was taken. |
| 10 | Further, I am not a relative or employee of any |
| 11 | attorney of record in this cause, nor do I have a |
| 12 | financial interest in the action. |
| 13 | Subscribed and sworn to on this the 1st day |
| 14 | of June, 2017. |

*[Signature: Keith McCabe]*

Keith McCabe, CSR No. 8873
Expiration Date: 12/31/2017
DepoTexas - Firm Registration No. 95
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
Phone: 281.469.5580