UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JACQUELINE SMITH,** | § | |
| *Plaintiff*, | § | |
| | § | **Cause No. 4:15-cv-02226** |
| **v.** | § | |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| *Defendant*. | § | |

### HARRIS COUNTY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE DR. PENN'S TESTIMONY

To the Honorable Ewing Werlein Jr., United States District Judge:

Defendant Harris County responds in opposition to Plaintiff's Opposed *Daubert* Motion to Exclude Certain Opinion Testimony by Defendant's Proposed Expert Joseph V. Penn, MD [Doc. 184] and would respectfully show as follows:

### SUMMARY OF THE ARGUMENT

Plaintiff improperly challenges the credibility of Dr. Joseph Penn's testimony, not its reliability. Dr. Penn's opinions are not "*ipse dixit*," but are well-reasoned and based on his extensive training and experience, his review of the records in this case, interviews with Harris County jail and medical personnel, discussions with correctional professionals, attendance at national correctional meetings, and a reasonable degree of medical and psychiatric certainty/probability.

### ARGUMENT & AUTHORITIES

Expert testimony is admissible so long as the expert is qualified and provides both relevant and reliable testimony.[1] A court should allow the testimony of an expert witness who is qualified by knowledge, skill, experience, training, or education to render an opinion based on scientific, technical, or other specialized

---

[1] FED. R. EVID. 702.

knowledge.[2] An expert witness may testify in the form of an opinion if he has "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact issue."[3]

A court should allow the testimony of an expert if it is reliable.[4] To be reliable, an expert's testimony must meet the following criteria: (1) the testimony must be based on sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must reliably apply the principles and methods to the facts of the case.[5] When reviewing the reliability of an expert's opinions, courts consider the following non-exhaustive factors: (1) the extent to which the expert's theory has been or can be tested, (2) the technique's potential rate of error, (3) whether the theory has been subjected to peer review or publication, (4) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, (5) the extent to which the technique relies on the expert's subjective interpretation, and (6) the nonjudicial uses of the theory or technique.[6] "'[W]hether *Dabuert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[7]

---

[2] FED. R. EVID. 702(a); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244–45 (3d Cir. 2008). *See also* FED. R. EVID. 104(a); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042–43 (2d Cir. 1995).

[3] FED. R. EVID. 702.

[4] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993).

[5] FED. R. EVID. 702. *See also United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002).

[6] *See Daubert*, 509 U.S. at 593–94.

[7] *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003) (quoting *Kumho Tire Co.*, 526 U.S. at 153).

Further, the expert's testimony must be relevant.[8] When evaluating a *Daubert* challenge to an expert, care must be taken not to exclude expert testimony where the challenge is more appropriately directed to the weight of the evidence rather than its admissibility.[9] Rejection of expert testimony is exception rather than the rule.[10]

Plaintiff makes several assertions throughout her motion that Dr. Penn's opinions are unreliable because they are "nothing more" than his own "speculation, guesswork and professional credentials." Plaintiff challenges Dr. Penn's methodology, claiming it is founded on a "scientifically unsound and unevenly applied methodology." Plaintiff asks the Court to exclude three of Dr. Penn's opinions. As explained below, each opinion is reliable and Dr. Penn's methodology is sound.

## I. Dr. Penn's undisputed qualifications

Dr. Penn is a board-certified forensic psychiatrist and general psychiatrist specializing in correctional medicine who has spent the last 20 years focusing his practice on adult psychiatry within correctional settings such as jails, prisons, and detention centers. For the last 10 years, Dr. Penn has served as the director of mental health services for UTMB Correctional Managed Care, overseeing psychiatric, psychological, and mental health services to approximately 80% of the entire Texas state jail and state adult prison population housed within the Texas Department of Criminal Justice facilities statewide. During this 10-year period, he has also been

---

[8] FED. R. EVID. 702.

[9] *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[10] Fed. R. Evid. 702 advisory committee's notes.

qualified as an expert witness in state and federal courts in the field of Forensic, Child and Adolescent, and Correctional Psychiatry.[11] Dr. Penn has taught, lectured, and published extensively on correctional psychiatry and suicide.[12]

While it appears Plaintiff does not challenge Dr. Penn's qualifications, she alleges his opinion is based in part on his "professional credentials," which she contends in part makes his opinions unreliable.[13] But as stated above, Dr. Penn is indisputably qualified to render psychiatry opinions in this case.

## II. Dr. Penn's opinions are unquestionably reliable

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[14]

The entirety of Plaintiff's motion can be summed up as follows: Plaintiff disagrees with Dr. Penn's opinions and, therefore, they are unreliable "*ipse dixit*." This is not a basis for alleging unreliability. As Plaintiff's motion reflects, Dr. Penn relied upon numerous documents and information in forming his opinions. Dr. Penn relied upon not only his own training, knowledge, and experience having worked in the correctional setting for 20 years, but also upon:

- notations and diagnoses by jail psychiatrists and mental health staff documenting Hawkins' "malingering" behavior,

---

[11] For a more complete description of his background and credentials, see Dr. Penn's CV, Exhibit 1.

[12] Ex. 1 (Penn CV).

[13] Doc. 182 at p. 11 (of 23). Other than this brief mention, Plaintiff's motion does not otherwise raise or support this argument. *See generally* Doc. 182.

[14] *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996).

4

- competency evaluations of Hawkins that concluded he had Antisocial Personality Disorder and Substance-Induced Psychotic Disorder with Hallucinations (in remission),

- Hawkins' artful and thoughtful handwritten letters and rap lyrics that evidenced Hawkins was logical and goal-oriented,

- nursing intake screening records and screening assessments documenting Hawkins' self-reported substance abuse,

- the DSM-V which contains descriptions, symptoms, and other criteria for diagnosing mental disorders,

- Hawkins' documented criminal history and assaultive offenses committed while in jail,

- Harris County policies and procedures, and

- deposition testimony and interviews with Harris County jail and medical staff.[15]

Certainly, it cannot be said that Dr. Penn's opinions are simply "guesswork" or "speculation" – they are based on documents and data that are inherently reliable and are uncontested. Harris County need show its expert's testimony is correct, only that it is reliable.[16]

**Opinion # 1: Hawkins did not suffer from a serious mental illness**

**Opinion # 2: If Hawkins suffered from any mental illness or disorder, it was the result of his history of abuse of illegal drugs**

---

[15] *See* Doc. 184 at p. 11 (of 23); Doc. 184-3 at pp. 5–6 (Penn Report) (listing documents reviewed and persons interviewed); Doc. 184-4 at p. 2 (Penn suppl. report,) (listing additional documents reviewed); Exhibit 2 (Penn Depo. at 6:23-7:8, 22:16-18, 94:24-96:2297:15-101:3102:10-103:19, 115:23-117:22, 152:24-154:8, 179:23-189:7, 237:10-245:14, 246:12-253:7, 253:14-256:22, 261:1-7); Exhibit 3 (Competency Evaluations); Exhibit 4 (Rap lyrics and letters to his family); Exhibit 5 (Hawkins' criminal history and assaultive offenses in jail).

[16] *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, No. H-06-2113, 2007 WL 4480134, at *2 (S.D. Tex. Dec. 18, 2007) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)).

Plaintiff asserts medical records show Hawkins was diagnosed with schizophrenia, schizoaffective disorder, and bi-polar and she objects to Dr. Penn's contrary opinion that Hawkins suffered not from these disorders, but rather from an anti-social personality disorder and a substance-induced psychotic disorder. Dr. Penn testified, "I think he had some mental illness, but it's -- it's difficult to definitively say what actual mental illness he had because he was so heavily involved in drugs and alcohol."[17] Dr. Penn explained that drug-induced psychosis is in the DSM-V and is considered a mental disorder, but not a serious or severe mental illness.[18]

Two of the documents relied upon by Dr. Penn in opining that Hawkins had a substance-induced psychotic disorder are the Competency Evaluations by licensed psychologist Dr. Steven Coats to determine whether Hawkins could stand trial.[19] Dr. Coats reviewed numerous records and interviewed Hawkins in which Hawkins admitted to substance abuse and denied psychotic symptoms *except* when he was intoxicated or incarcerated:

> [Hawkins] endorsed a history of substance abuse involving "Marijuana, embalming fluid, Cocaine, Xanax and alcohol" that began at the age of "15" years, consuming "Marijuana and embalming fluid, two blunts a day, and like three Xanax a day" that "always" resulted in intoxication ("being high"). It is noteworthy that [Hawkins] denied experiencing psychotic symptoms outside of

---

[17] Ex. 2 (Penn Depo. at p. 48:3-13).

[18] Ex. 2 (Penn Depo. at p. 255:24-256:22). DSM–V stands for Diagnostic and Statistical Manual of Mental Disorders by the American Psychiatric Association. This manual is used by clinicians and researchers to classify mental disorders.

[19] Ex. 2 (Penn Depo. at p. 98:4-99:5).

voluntary intoxication except during times of sobriety while incarcerated ("jail").[20]

Dr. Penn reviewed jail records to identify the drugs Hawkins self-reported using or abusing and noted that Hawkins was using marijuana pretty significantly and laced with formaldehyde.[21] Dr. Penn has a lot of experience in substance abuse issues, and in particular marijuana laced with formaldehyde.[22] He testified this type of drug abuse can really damage the brain and cause permanent psychosis even if only used once – he said some would end up in the forensic unit for years.[23] Dr. Penn further relied upon the diagnoses and findings of the Harris County jail psychiatrists who saw Hawkins in the months prior to his death and who were not convinced Hawkins had a serious mental illness, but instead diagnosed him as malingering, which is in the DSM-V as a code diagnosis.[24]

Dr. Penn testified that active symptoms of psychosis include bizarre, strange, or disorganized belief system of behaviors and experiencing delusions (fixed false belief).[25] He opined that Hawkins was only documented to be experiencing one of these symptoms – occasional self-reporting of auditory hallucinations.[26] Dr. Penn agreed with Dr. Coats' finding that any residual effects of auditory hallucinations

---

[20] Ex. 3 at Bates # Smith 6971 (Competency Evaluation). *See also id.* at Bates # Smith 6977, in which Hawkins advised Dr. Coats his substance abuse had caused him problems with "memory loss" and had the potential to "kill people."

[21] Ex. 2 (Penn Depo. at p. 253:14-255:1).

[22] Ex. 2 (Penn Depo. at p. 240:3-18).

[23] *Id.*, see also at p. 255:4-11.

[24] Ex. 2 (Penn Depo. at p. 47:5-23, 94:20-96:9). *See* Ex. 6 (MHMRA documentation of Hawkins' malingering).

[25] Ex. 2 (Penn Depo. at p. 100:4-12).

[26] *Id.*

was the result of Hawkins' extensive history of voluntary abuse of or dependence on alcohol, Xanax, cocaine, and marijuana laced with embalming fluid and that Hawkins had a drug-induced psychosis, if anything.[27] However, he pointed out that Hawkins knew "what to say and how to say it" – as evidenced by his letter to his grandmother *telling her he didn't want to go back to state jail so he told his lawyer he was feeling suicidal and hearing voices so she helped him get to Rusk State Hospital.*[28] The date stamp on the envelope of this letter is October 21, 2010.[29] Plaintiff's Exhibit H is a Rusk State Hospital report reflecting a diagnosis of "schizophrenia", which was dated three days earlier, October 18, 2010.[30]

Plaintiff's Exhibit G is a one-page nursing note from Methodist Willowbrook hospital, purportedly as evidence of Hawkins' alleged schizophrenia.[31] However, the chart and discharge diagnosis (which Plaintiff omitted) show the truth: Hawkins lied and told 911 he was suicidal and hearing voices so that he could stay in the hospital since he didn't have a place to sleep that night:

> "<u>I'm gonna be honest, I didn't have a place to stay last night cuz my people fell through, so I called 911 and told them I was hearing voices so I could have a place to sleep</u>." When asked patient if he made it all up, he put his head down and stated that yes he did. Denies hallucinations or paranoia now...D/w MAT team <u>Sandra who evaluated person earlier and states that she thought he might have been malingering as well earlier</u>."[32]

---

[27] Ex. 2 (Penn Depo. at p. 95:16-23, 99:1-5, 100:20-22).

[28] Ex. 2 (Penn Depo. at p. 100:13-18). *See also* Ex. 4 at Bates # Smith 7036 (letter to Lorene Hawkins).

[29] Ex. 4 at Bates # Smith 7035 (envelope for letter to Lorene Hawkins).

[30] This exhibit was filed under seal in support of Plaintiff's Motion, Doc. 184.

[31] This exhibit was filed under seal in support of Plaintiff's Motion, Doc. 184.

[32] Ex. 7 at Bates # Smith 12633, 12636-38 (medical record excerpts from Methodist Willowbrook hospital) (emphasis added). Note in particular, Bates # 12638.

Both of Hawkins' admissions above, in 2010 and 2012, are entirely consistent with his malingering noted by MHMRA psychiatrists in 2014 shortly before Hawkins died and with Dr. Penn's opinions that Hawkins knew what to say and how to say it to obtain secondary gain.[33] Hawkins' manipulation was not just limited to jail, but also outside of the jail.

Dr. Penn reviewed clinical records for Hawkins when he was seen by community providers and noted that in none of their diagnosis did they know the extent or severity of Hawkins' use of drugs, alcohol, and marijuana laced with embalming fluid, whereas MHMRA in the jail did know these facts and took them into consideration.[34] Dr. Penn thought it was significant that Hawkins did not exhibit the psychotic symptoms as much while in jail where he could not easily obtain marijuana, embalming fluid, Xanax, and cocaine.[35]

Dr. Penn took other important considerations into account in dismissing schizophrenia, schizoaffective disorder, and bipolar disorder, such as the fact Hawkins' "activities of daily living were fine, his grooming, his hygiene, his eating. He – he was not paranoid about eating. He never talked about bizarre or strange paranoia or suspiciousness" and there was "no evidence of a break from reality" during his time in jail.[36]

Dr. Penn recognized there are very subtle differences between a patient with schizophrenia versus schizoaffective disorder versus substance-induced

---

[33] Ex. 2 (Penn Depo. at p. 43:13-44:25; 90:18-91:25).

[34] Ex. 2 (Penn Depo. at p. 102:20-25).

[35] Ex. 2 (Penn Depo. at p. 103:1-6).

[36] Ex. 2 (Penn Depo. at p. 103:7-15). See also *id.* at p. 107:8-109:3 (noting Hawkins never required assistance with his ADLs – he lived by himself, bathed and groomed himself and held three different jobs).

9

psychosis.[37] However, what is remarkably different is that, with schizophrenia and schizoaffective disorder, a person will continue to show psychotic symptoms whether or not they are using drugs and alcohol, whereas a person with substance-induced psychosis will see the psychosis go away or diminish significantly once they stop the illicit substance, the latter of which is what happened with Hawkins.[38] In jail or prison settings, inmates are often misdiagnosed as having schizophrenia or having a psychotic disorder when they self-report hearing voices.[39]

Other factors that Dr. Penn considered that go against any finding of schizophrenia, schizoaffective disorder, or psychosis is that Hawkins was able to communicate with others – with MHMRA's Chelsea Ford (he wanted to and did demonstrate his rap lyrics to her) and with jail staff to let them know when he was in distress, as evidenced by the jail records.[40]

Dr. Penn also noted that sometimes a diagnosis from a hospital is unreliable because it is based on self-reported statements from the patient.[41] This was seen when Hawkins was admitted to Methodist Willowbrook hospital, when he initially lied about hearing voices but admitted he made it up when pressed.

Dr. Penn opined that Hawkins also had Antisocial Personality Disorder because he met the diagnostic criteria for it, which was found by several psychiatrists and Dr. Coats who evaluated Hawkins.[42] This finding is supported by

---

[37] Ex. 2 (Penn Depo. at p. 114:13-15).

[38] Ex. 2 (Penn Depo. at p. 114:16-115:3).

[39] Ex. 2 (Penn Depo. at p. 118:13-24).

[40] Ex. 2 (Penn Depo. at p. 144:143:25-145:7). See also Ex. 8 (jail records evidencing Hawkins' request for mental health treatment at Bates # HC 5519, 5525-5528, 5530).

[41] Ex. 2 (Penn Depo. at p. 200:2-14).

[42] Ex. 2 (Penn Depo. at p. 141:1-142:1, 247:19-23).

Hawkins' demonstrated poor impulse control and poor judgment – violating people's rights with a repetitive pattern of disregard for the rights of others by stealing, robbing, and fighting with other inmates.[43] Based on Dr. Penn's experience as a Board-certified child psychiatrist, there are certain signs when a child is growing up that might lead to an antisocial personality disorder as an adult.[44] Dr. Penn noted that Hawkins had a really difficult childhood – he was raised by his mother and then moved in with his grandmother and bounced back and forth between them and seemed to have a more loving and caring relationship with his grandmother. This was further evidenced by his letters from jail to her.[45] In addition, while he was young, his father was in jail and later died while in jail.[46] The most important factor was Hawkins' pattern of adolescent antisocial behavior that would qualify him for a diagnosis of conduct disorder, a repetitive and persistent disregard for the rights and violation of rules and authority, starting before age 10. And he did that, stealing cars and property and picking up crime as a juvenile, which landed him in TDCJ for 6 years for aggravated robbery when he was a teenager.[47]

Dr. Penn opined that for an adult to have antisocial personality disorder, they would first need to have a conduct disorder. He found that Hawkins met the criteria

---

[43] Ex. 2 (Penn Depo. at p. 138:11-142:1). *See also* Ex. 5 (Hawkins' Disciplinary History and JIMS record for other criminal offenses).

[44] Ex. 2 (Penn Depo. at p. 247:19-6).

[45] Ex. 4.

[46] Ex. 2 (Penn Depo. at p. 247:19-249:11).

[47] *Id*. *See also* Ex. 9 (Pl.'s Depo. at p. 25:20-26:9).

11

for both.**48**  Plaintiff has presented no facts or evidence that would refute this reliable opinion by Dr. Penn.

Plaintiff's allegations that Dr. Penn's opinions concerning Hawkins' mental illness are unreliable and speculative are incorrect.  As demonstrated above, his opinions are based on his extensive training and experience. The documents, information, and data underlying his opinions is reliable.

### Opinion # 3: Hawkins suicide was impulsive and unpredictable by Harris County

Ironically, Plaintiff's argument acknowledges that "suicide is often unpredictable."**49** The entirety of Plaintiff's complaint is that Dr. Penn failed to account for the "relevant scientific literature" regarding suicide risk factors.  This "literature" consists of three publications that have never been previously disclosed to Harris County and cannot be used to support Plaintiff's motion.**50**  The 2018 publication came out after Dr. Penn's September 13, 2017 deposition and his February 2018 supplemental report.  It is nonsensical for Plaintiff to argue he ignored this publication because it was not in existence when his opinions were rendered.  The 2017 publication concerns a study performed in Spain and thus, is not one of Dr. Penn's "peers."  This study is likewise irrelevant to this case because it was a telephone management program aimed at determining the effectiveness over a year of a follow-up on patients discharged from an emergency room after their first suicide attempt.

---

**48**      Ex. 2 (Penn Depo. at p. 249:8-11).

**49**      Doc. 184 at p. 18 (of 23).

**50**      FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a mtion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.").

The final article, published in 2010 in the British Journal of Psychiatry, is likewise not one of Dr. Penn's "peers." This article, while concerning a case study on psychiatric disorders in male prisoners who made near lethal suicide attempts, does not provide any information that would assail the opinions given by Dr. Penn. In fact, none of these publications discredit Dr. Penn's opinions and the conclusory allegation that his opinion was rendered "without taking into account important and necessary 'facts and data'" is simply incorrect.

Dr. Penn's opinion stated: "Because of Mr. Hawkins' refusal to communicate any suicidal ideation, intent or plan to any Harris County Jail staff member prior to his impulsive self-injurious act, it is my opinion that Mr. Hawkins' suicide was an impulsive decision, and thereby, not predicable by Harris County jail, medical or mental health providers."

The underlying facts and data are undisputed. It is not disputed that in the time period shortly before Hawkins committed suicide, MHMRA psychiatrists diagnosed Hawkins as malingering when he presented with alleged suicidal ideation.[51] Dr. Penn noted that the most difficult patients to identify and safely manage in a correctional setting are those who have been manipulative and exaggerated their symptoms, like Hawkins.[52] Two mental health professionals, LPHA intern Chelsea Ford and psychiatrist Dr. Enrique Huerta, evaluated Hawkins in the days before he died and neither of them determined Hawkins posed a risk of suicide.[53] Hawkins told Ms. Ford the day before he died that he was not presently

---

[51] Ex. 6 (MHMRA records reflecting "malingering" diagnosis).

[52] Ex. 2 (Penn Depo. at p. 153:7-154:8).

[53] Ex. 2 (Penn Depo. at p. 179:23-184:10).

experiencing suicidal ideation and he would notify her if his symptoms worsened – he did not.[54]

There is further no dispute that on the day Hawkins died and in the days leading up to it, he did not communicate to jail staff that he was feeling suicidal or exhibiting any behavior that could be thought to indicate he would harm himself.[55]

Hawkins' suicide occurred during shift change and in a timely fashion. Because of the absence of evidence of Hawkins being in crisis and actively suicidal, and because of the mental health professional's evaluations that Hawkins was not at risk of suicide, Dr. Penn's opinion that Harris County could not have predicted or prevented Hawkins' suicide is reliable and based on reliable facts and data.

## III. Dr. Penn's opinions are relevant

Plaintiff does not dispute that Dr. Penn's opinions are relevant to the parties' claims and defenses. An expert's opinions are relevant if the reasoning and methodology can be properly applied to the facts and can assist the trier of fact in resolving an issue.[56] An expert's testimony does not need to relate directly to the ultimate issue that is to be resolved by the trier of fact; it only needs to be relevant to evaluating a factual matter.[57] Here, Dr. Penn's challenged opinions are relevant. Dr. Penn's first and second challenged opinions—(1) whether Hawkins suffered a mental illness and (2) whether Hawkins's substance abuse caused his mental

---

[54] *Id*. *See also* Ex. 6, Bates # HC 1474 (MHMRA record by Chelsea Ford noting interaction with Hawkins on Feb. 4, 2018).

[55] Ex. 2 (Penn Depo. at p. 180:8-14). See also Ex. 10, Officer Cano depo, p. 67:13-68:14.

[56] FED. R. EVID. 702(a); *Daubert*, 43 F.3d at 1321–22.

[57] *Hall Arts Ctr. Office, LLC v. Havover Ins. Co.*, --- F. Supp. 3d ---, No. 3:16-CV-3226-D, 2018 WL 4206978, at *17 (N.D. Tex. Aug. 27, 2018) (citing, among others, *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000)); *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002) (citing same).

illness—are relevant to whether Hawkins is a qualified individual with a disability, which are essential elements of Plaintiff's claims under the ADA and RA.**58** As discussed above, Dr. Penn's reasoning and methodology are properly applied to the facts of this case, which show that other providers *also* questioned whether Hawkins suffered any mental illness and, if so, whether his substance abuse caused the mental illness.

Dr. Penn's opinion regarding the unpredictability of Hawkins's suicide is directly relevant to another essential element, i.e., whether the Harris County jail denied Hawkins participation in or excluded him from benefits of a program service or activity, or otherwise discriminated against him, by reason of his disability.**59** It is undisputed that no one, including Hawkins, requested any accommodation.**60** Thus, Harris County can only be liable if the need for an accommodation was open, obvious, or apparent. *Id.* According to Dr. Penn's opinion, Hawkins's suicide was unpredictable and, therefore, relevant to whether it was open, obvious or apparent.

## CONCLUSION & REQUEST FOR RELIEF

Dr. Penn is qualified as an expert in the field of psychiatry and his opinions are reliable and relevant.

For these reasons, Harris County respectfully requests the Court to deny Plaintiff's motion to exclude certain opinions and for such other and further relief to which Harris County shows itself justly entitled.

**Date: September 7, 2018**

---

**58**   42 U.S.C. § 12132; 29 U.S.C. § 794(a); *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 235 (5th Cir. 2017).

**59**   42 U.S.C. § 12132; *Windham*, 875 F.3d at 235. *See also* 29 U.S.C. § 794(a).

**60**   *Gonzalez v. Bexar Cnty., Tex.*, No. SA-13-CA-539, 2014 WL 12513177, at *5 (W.D. Tex. Mar. 20, 2014) (citing *Zarazoga v. Dallas Cnty.*, No. 3:07-CV-1704-K, 2009 WL 2030436, at *11 (N.D. Tex. July 13, 2009); *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996)).

Respectfully submitted,

By: */s/ Laura Beckman Hedge*
**LAURA BECKMAN HEDGE**
Assistant County Attorney
**Attorney-in-Charge**
Texas Bar No. 11373900
Southern District of Texas No. 12524

HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5137
Facsimile: (713) 755-8924
Email: Laura.Hedge@cao.hctx.net

**OF COUNSEL:**

VINCE RYAN
Harris County Attorney

KEITH A. TOLER
Assistant County Attorney
Texas Bar No. 24088541
Southern District of Texas No. 2599245

HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5265
Facsimile: (713) 755-8924
Email: Keith.Toler@cao.hctx.net

**COUNSEL FOR DEFENDANT
HARRIS COUNTY, TEXAS**

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2018, I filed a true and correct copy of the foregoing response in opposition with the Court's CM/ECF system, which will automatically serve a Notice of Electronic Filing on all parties' counsel.

**Plaintiff's Counsel**

Hannah Herzog
Natalia Cornelio
Texas Civil Rights Project – Houston
2006 Wheeler Avenue
Houston, Texas 77002

Ranjana Natarajan
The University of Texas School of Law
Civil Rights Clinic
727 East Dean Keeton Street
Austin, Texas 78705

Tom Gutting
King & Spaulding
1100 Louisiana, Ste. 4000
Houston, Texas  77002

*/s/  Laura Beckman Hedge*
**LAURA BECKMAN HEDGE**
Assistant County Attorney