UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JACQUELINE SMITH, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 4-15-CV-2226 |
| HARRIS COUNTY, TEXAS, | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S AMENDED MOTION
FOR SUMMARY JUDGMENT AND REQUEST FOR ORAL ARGUMENT**

**NATALIA CORNELIO**
Illinois Bar No. 6289267
Southern District No. 1278866
TEXAS CIVIL RIGHTS PROJECT
405 Main St, Suite 716
Houston, Texas 77002
Tel: (832) 767-3650
Fax: (832) 554-9981
natalia@texascivilrightsproject.org

**RANJANA NATARAJAN**
Texas Bar No. 24071013
Southern District No. 2147709.
THE UNIVERSITY OF TEXAS SCHOOL
OF LAW
Civil Rights Clinic
727 E. Dean Keeton St.
Austin, TX 78705
Tel: (512) 232-7222
rnatarajan@law.utexas.edu

**THOMAS M. GUTTING**
State Bar No. 24067640
S. Dist. No. 24067640
KING & SPALDING LLP
1100 Louisiana, suite 4000
Houston, Texas 77002
Tel: (713) 276-7358
tgutting@kslaw.com

*Attorneys for Plaintiff Jacqueline Smith In
Her Capacity as Executor of the Estate of
Danarian Hawkins, Deceased.*

October 16, 2018

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................... i

TABLE OF AUTHORITIES ....................................................................................... ii

NATURE AND STAGE OF THE PROCEEDING........................................................ 1

STATEMENT OF ISSUES ......................................................................................... 1

STANDARD OF REVIEW .......................................................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................... 2

FACTUAL BACKGROUND ....................................................................................... 2

I.      Discrimination Under the ADA and the RA ..................................................... 4

II.     Hawkins Was a Qualified Individual with a Disability Under the ADA and RA .............. 5

III.    Harris County Failed to Accommodate Hawkins' Disabilities and Limitations .............. 11

    A.   Applicable Law................................................................................... 12

    B.   Harris County Failed to Accommodate Hawkins' Limitations at Every Level............ 13

        1.   Hawkins' Disabilities and Limitations Were Open, Obvious, and Apparent .......... 13

        2.   Harris County Failed to Reasonably Accommodate Hawkins by Replacing His Bed Sheet with a Suicide Blanket ...................................................... 16

        3.   Harris County Failed to Reasonably Accommodate Hawkins by Modifying The Cell Smoke Detector to Prevent Him from Using it as a Tie-Off Point .................. 18

        4.   Harris County Failed to Reasonably Accommodate Hawkins by Removing the Towel Covering His Window ...................................................... 20

        5.   Harris County, Through the Actions of Chelsea Ford, Failed to Reasonably Accommodate Hawkins' Limitations by Increasing Monitoring and Referring Him to the MHU After His Suicidal Statement on February 4........................................... 23

        6.   Harris County Failed to Reasonably Accommodate Hawkins by Conducting 25-Minute Observation Rounds Required Under its Own Policy................................. 28

        7.   Harris County Failed to Reasonably Accommodate Hawkins by Monitoring Him More Closely in 5-10 Minute Rounds ...................................................... 31

    C.   Plaintiff's Claims are not Based on Dr. Huerta's "Medical Decision"......................... 33

IV.     Whether Harris County "Intentionally" Discriminated is a Question for the Jury.......... 37

V.      Each of Harris County's Actions Above Also Was Intentional Discrimination.............. 38

VI.     The Court Should Deny Defendant's Motion as to Plaintiff's RA Claims....................... 39

VII.    Conclusion and Relief Sought .......................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. v. St. Louis Cty., Mo.*,
    891 F.3d 721 (8th Cir. 2018) .......................................................................35, 36

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015)...................................................................................19

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ......................................................................26

*Armstrong v. Turner Indus., Inc.*,
    141 F.3d 554 (5th Cir 1998) .........................................................................36

*Bennett-Nelson v. La. Bd. of Regents*,
    431 F.3d 448 (5th Cir. 2005) ..............................................................5, 12, 37, 40

*Borum v. Swisher Cty.*,
    2015 WL 327508 (N.D. Tex. Jan. 26, 2015) .................................................5

*Bruff v. N. Miss. Health Servs., Inc.*,
    244 F.3d 495 (5th Cir. 2001) ........................................................................13

*Burger v. Bloomberg*,
    418 F.3d 882 (8th Cir. 2005) (per curiam)....................................................36

*Castle v. Eurofresh, Inc.*,
    731 F.3d 901 (9th Cir. 2013) ........................................................................26

*Celotex. Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................1

*Chandler v. Specialty Tires of Am. (Tenn.), Inc.*,
    134 F. App'x 921 (6th Cir. 2005) .................................................................9

*Delano-Pyle v. Victoria Cty., Tex.*,
    302 F.3d 567 (5th Cir. 2002) ................................................................4, 37, 39

*EEOC v. LHC Group, Inc.*,
    773 F.3d 688 (5th Cir. 2014) ........................................................................1

*Esparza v. Univ. Med. Ctr. Mgmt. Corp.*,
    2017 WL 4791185 (E.D. La. Oct. 24, 2017) ................................................26

*Fitzgerald v. Corr. Corp. of Am.*,
    403 F.3d 1134 (10th Cir. 2005) ....................................................................28, 36

ii

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) (en banc) ............................................................6, 40

*Garza v. City of Donna*,
    2017 WL 2861456 (S.D. Tex. July 5, 2017).............................................................10

*Good Shepherd Manor Found., Inc. v. City of Momence*,
    323 F.3d 557 (7th Cir. 2003) .................................................................................37

*Harkless v. Brazoria Cty., Tex.*,
    2016 WL 1702595 (S.D. Tex. April 28, 2016)........................................................13

*Haybarger v. Lawrence Cty. Adult Prob. & Parole*,
    551 F.3d 193 (3d Cir. 2008)....................................................................................40

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ...................................................................................12

*Hinojosa v. Livingston*,
    994 F. Supp. 2d 840 (S.D. Tex. 2014) .........................................................6, 12, 39

*Hott v. Hennepin Cty., Minn.*,
    260 F.3d 901 (8th Cir. 2001) ..................................................................................36

*J.V. v. Albuquerque Pub. Sch.*,
    813 F.3d 1289 (10th Cir. 2016) ..............................................................................39

*Johnson v. Gambrinus Co./Spoetzl Brewery*,
    116 F.3d 1052 (5th Cir. 1997) ................................................................................13

*Kemp v. Holder*,
    610 F.3d 231 (5th Cir. 2010) ....................................................................................5

*Kerr v. Heather Gardens Ass'n*,
    2010 WL 3791484 (D. Colo. Sept. 22, 2010).........................................................26

*Liebe v. Norton*,
    157 F.3d 574 (8th Cir. 1998) ..................................................................................36

*Martin v. Brown Schools Education Corporation*,
    2003 WL 21077454 (N.D. Tex. Mar. 14, 2003).....................................................10

*McCollum v. Livingston*,
    2017 WL 608665 (S.D. Tex. Feb. 3, 2017) .......................................................6, 12, 27, 39

*McGugan v. Aldana-Bernier*,
    752 F.3d 224 (2d Cir. 2014).....................................................................................28

*Melton v. Dall. Area Rapid Transit*,
    391 F.3d 669 (5th Cir. 2004) ..........................................................4, 38, 39

*Mileski v. Gulf Health Hosps., Inc.*,
    2016 WL 1295026 (S.D. Ala. Mar. 31, 2016) ..........................................9

*Miraglia v. Bd. of Supervisors of La. State Museum*,
    901 F.3d 565 (5th Cir. 2018) ...................................................................37

*Pa. Dep't of Corrs. v. Yeskey*,
    524 U.S. 206 (1998) ..............................................................................4, 6

*Perez v. Doctors Hosp. at Renaissance, Ltd.*,
    624 F. App'x 180 (5th Cir. 2015) ...................................................37, 38, 39

*Peters v. Baldwin Union Free Sch. Dist.*,
    320 F.3d 164 (2d Cir. 2003).......................................................................9

*Phillips v. Tiona*,
    508 F. App'x. 737 (10th Cir. 2013) .........................................................26

*Potts v. Crosby Indep. Sch. Dist.*,
    2005 WL 1527657 (S.D. Tex. June 28, 2005) .........................................40

*Punt v. Kelly Services*,
    862 F.3d 1040 (10th Cir. 2017) ...............................................................37

*Riel v. Elec. Data Sys. Corp.*,
    99 F.3d 678 (5th Cir. 1996) ......................................................................13

*Rogers v. Bromac Title Serv's, L.L.C.*,
    755 F.3d 347 (5th Cir. 2014) ......................................................................1

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1289 (11th Cir. 2005) ..........................................................28, 36

*Shelton v. Ark. Dep't of Human Servs.*,
    677 F.3d 837 (8th Cir. 2012) ..............................................................35, 36

*Siefken v. Vill. of Arlington Heights*,
    65 F.3d 664 (7th Cir. 1995) ......................................................................36

*Steele v. Rowles*,
    2009 WL 2905903 (E.D. Tex. Sept. 3, 2009), *aff'd*, 389 F. App'x 347 (5th
    Cir. 2010)..................................................................................................10

*Stokes v. City of Montgomery*,
    2008 WL 4369247 (M.D. Ala. Sept. 25, 2008) ........................................9

*Thomlinson v. City of Omaha*,
  63 F.3d 786 (8th Cir. 1995) ...................................................................................40

*Tracy v. Fin. Ins. Mgmt. Corp.*,
  458 F. Supp. 2d 734 (S.D. Ind. 2006) .......................................................................9

*Trafton v. Sunbury Primary Care, P.A.*,
  689 F. Supp. 2d 180 (D. Me. 2010) ...........................................................................9

*Tsombanidis v. W. Haven Fire Dep't*,
  352 F.3d 565 (2d Cir. 2003).............................................................................38, 39

*U.S. Airways, Inc. v. Barnett*,
  535 U.S. 391 (2002)...............................................................................................12

*Val Velzor v. City of Burleson*,
  43 F. Supp. 3d 746, 752 (N.D. Tex. 2014) .......................................12, 13, 20, 33

*Wade v. Montgomery County, Texas*,
  2017 WL 7058237 (S.D. Tex. Dec. 6, 2017)............................................................10

*Wilkins-Jones v. County of Alameda*,
  859 F. Supp. 2d 1039 (N.D. Cal. 2012) ...................................................................26

*Windham v. Harris Cty., Tex.*,
  875 F.3d 229 (5th Cir. 2017) ..................................................................................12

*Wright v. Tex. Dep't of Criminal Justice*,
  2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) .......................................6, 9, 12, 39

**Statutes**

29 U.S.C. § 701 ...........................................................................................................39

29 U.S.C. § 705 .................................................................................................5, 8, 10

29 U.S.C. § 794 ......................................................................................................5, 39

42 U.S.C. § 1983 ...........................................................................................................4

42 U.S.C. § 12102 ......................................................................................5, 7 , 8, 10, 11

42 U.S.C. § 12131 .....................................................................................................5, 11

42 U.S.C. § 12132 .....................................................................................................4, 11

Tex. Local Gov. Code § 351.041(a) .........................................................................39

**Rules**

Fed. R. Civ. P. 56 ................................................................................................1

**Regulations**

28 C.F.R. § 35.130 ............................................................................................26

28 C.F.R. § 35.152 ............................................................................................17

29 C.F.R. § 1630.2 ..............................................................................................9

Tex. Admin. Code § 263.31 ...............................................................................19

Tex. Admin. Code § 263.51 ...............................................................................19

## NATURE AND STAGE OF THE PROCEEDING

Danarian Hawkins committed suicide in the Harris County jail on February 5, 2014. Plaintiff brought this lawsuit as administrator of his estate alleging violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Discovery has now closed, Defendant has moved for summary judgment, Doc. 194, and Plaintiff hereby responds.

## STATEMENT OF ISSUES

**Issue 1:** Despite knowing Hawkins' history of suicidal behavior, Harris County placed Hawkins into the same cell, with the same smoke detector and bed sheet with which he had previously attempted suicide, and failed to adequately monitor him. Is Plaintiff entitled to a jury trial as to whether Harris County discriminated against Hawkins in violation of the ADA and the RA?

**Issue 2:** Does Harris County receive federal funding such that the RA applies to its discrimination, and if so, was that discrimination solely on the basis of Hawkins' disability?

## STANDARD OF REVIEW

Summary judgment is proper only if the evidence before the court shows no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of showing that the evidence in the record demonstrates an absence of genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. A court reviewing a motion for summary judgment must "construe all facts and inferences in the light most favorable to the nonmoving party." *Rogers v. Bromac Title Serv's, L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). The court should "refrain from making credibility determinations or weighing the evidence," which are tasks for the fact-finder at trial. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## SUMMARY OF THE ARGUMENT

Danarian Hawkins suffered from serious, debilitating mental illnesses that limited his ability to care for himself, to think, to sleep, to concentrate, and to work. These disabilities and limitations were open, obvious, and apparent to Harris County, which failed to reasonably accommodate his needs so that he could meaningfully enjoy the benefits of safe confinement in the Harris County jail. More specifically, Harris County denied Hawkins: (1) the benefit of safe housing by failing to replace his bed sheet with a suicide blanket or modify his cell's smoke detector when placing him in the same type of cell in which he previously had attempted to hang himself using those same tools; and (2) the benefit of adequate monitoring by not ordering him to remove the towel covering his cell window, not referring him to the jail's mental health unit or informing housing personnel after a suicidal statement, and not conducting observation rounds in accordance with its own policies, let alone with the frequency Hawkins required.

Plaintiff has developed extensive evidence in discovery that demonstrates issues of material fact on all key aspects of this case, and it should be left to a jury to decide them. The Court should deny Defendant's motion for summary judgment.[1]

## FACTUAL BACKGROUND

Hawkins committed suicide in the Harris County jail on February 5, 2014, by using his bed sheet to hang himself from the smoke detector of his administrative separation ("Ad Sep") cell, 2J2-R. Ex. 1, HC 66-67 (incident report); Ex. 8, HC 4540-42 (housing history); Ex. 7, 4523 (cellblock descriptor); Ex. 27, Martin Dep. 89:15-25 (Ad Sep cells are "23-hour lockdown cells"). His suicide was no surprise. Mental health staff in the jail mental health unit ("MHU")

---

[1] Plaintiff in good faith alleged in her complaint independent violations of the ADA with respect to Harris County's failure to train and denial of visitation. Doc. 21. With the benefit of discovery, Plaintiff does not at this time advance these or any claim for equitable relief. Plaintiff preserves her right to present evidence with respect to training, policies, and procedures as it pertains to the claims she advances in this brief.

had for years assessed him as suffering from numerous severe mental illnesses, and he had been in and out of the MHU repeatedly due to at least **25** incidents in which he reported hearing voices tell him to kill himself, tied his pants or bed sheet around his neck, or attempted to commit suicide. *See* Ex. 1, HC 64-166 (incident reports); Ex. 9, HC 4543-75 (transfer sheets to and from MHU); Ex. 3, HC 9203-07; Ex. 18, HC 3613, 3617, 3620, 4509, 6350, 6876, (schizoaffective disorder, bipolar disorder, major depressive disorder).

Before his suicide, Hawkins attempted to kill himself in the Harris County jail at least once by overdose, three times by hanging with his pants, and four times by hanging with his bed sheet. Ex. 1, HC 54; 64-65; 73-75; 103; 126; 128; 132; 134; 151. In one incident, ten months before his death, he almost succeeded by tying his bed sheet around his neck and hanging himself from the smoke detector in his Ad Sep cell. *Id.* at HC 73-75. He tried again two months later, this time by overdose, resulting in a month-long hospital stay. Ex. 18, HC 54; Ex. 1, 5524. His last failed attempt was on January 17, 2014, three weeks before his death; he tried to hang himself with his bed sheet from the top rail of the upper deck of the Ad Sep cellblock. Ex. 1, HC 64-65. He was admitted to the MHU and released on January 31, 2014. *Id.*; Ex. 9, HC 4574-75.

Upon that release, and despite Hawkins' record of mental illnesses, numerous suicidal acts, and suicide attempts, Harris County decided to house him in the same Ad Sep cell, with the same smoke detector and the same bed sheet as those he had used in his prior suicide attempts. Ex 8, HC 4540-42; Ex. 1, HC 66-67. It did not provide him any monitoring beyond that it provided all other inmates. *See generally* Doc. 194. Four days later, Chelsea Ford, an employee of Harris County's mental health services contractor, MHMRA,[2] visited Hawkins. Ex. 2, HC 1474. He told her he had just been discharged from the MHU after being admitted for trying to

---

[2] MHMRA was the Mental Health and Mental Retardation Authority of Harris County, which contracted with Harris County to provide mental health care to inmates in the jail. Ex. 16, HC 4422-4446 (Interlocal Agreement). Harris County MHMRA is now known as "The Harris Center for Mental Health and IDD."

hang himself, and that the voices in his head made him want to kill himself. *Id.* Ford did nothing. Doc. 194 at 13. She violated policy by failing to alert housing officers in order to obtain closer monitoring for him and failing to refer him to a psychiatrist Ex. 13, HC 272; Ex. 16, HC 4426; Ex. 14, Smith 6258. The next evening, officers allowed him to cover his cell window, so they could not observe him, again in violation of policy, which required unobstructed views into cells for monitoring. Ex. 1, HC 66-67; Ex. 13, HC 288-290. Hawkins then hanged himself using the smoke detector and bed sheet "in exactly the same way" as he had attempted ten months prior. *See* Ex. 22, Cano Dep. 98:12-99:1. His body was not found until ten minutes after the next shift change. Ex. 1, HC 66-67. Efforts to resuscitate him failed. Ex. 18, HC 6656-57.

## I.   Discrimination Under the ADA and the RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Jails and prisons are "public entities" for this purpose. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998).

To make out a prima facie claim of discrimination under Title II, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671 (5th Cir. 2004).[3]

---

[3] Under the ADA and RA a "public entity is liable for the vicarious acts of *any* of its employees," and, unlike under 42 U.S.C. § 1983, "neither a policymaker, nor an official policy must be identified." *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002).

4

The ADA's prohibition on discrimination "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005). "This 'reasonable accommodation' theory of discrimination is different from, yet related to, the prima facie case of disability-based discrimination discussed above. Specifically, a plaintiff can satisfy the second and third prongs of the prima facie case of disability discrimination by establishing that the public entity has failed to make reasonable accommodations for a disabled person who uses the services provided by the public entity." *Borum v. Swisher Cty.*, 2015 WL 327508, at *4 (N.D. Tex. Jan. 26, 2015) (citing *Garrett v. Thaler,* 560 F. App'x 375, 382 (5th Cir. 2014)).

Finally, the rights and remedies under the ADA and RA are "almost entirely duplicative." *See Bennett-Nelson*, 431 F.3d at 454; *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (The RA and the ADA are judged under the same legal standards.").[4]

## II.   Hawkins Was a Qualified Individual with a Disability Under the ADA and RA

"The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see Kemp*, 610 F.3d at 234-235 ("qualified individuals" standard under ADA and RA is the same). In turn, a "disability" is defined as either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1); *accord* 29 U.S.C. § 705(9).

---

[4] *See* 29 U.S.C. 794(a) ( "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

To begin with, Hawkins was a "qualified individual," i.e., he met the "essential eligibility requirements" for safe confinement in the Harris County jail, including safe housing and adequate monitoring, because he was an inmate and all inmates were so-qualified. This is because the Supreme Court has interpreted Title II with reference to what "services, programs, or activities" are actually provided by the public entity. *See Yeskey*, 524 U.S. at 210; *Frame v. City of Arlington*, 657 F.3d 215, 226-27 (5th Cir. 2011) (en banc). Defendant's correctional expert, Rule 30(b)(6) witness, and other employees admit that safe confinement is a service the jail provides to all inmates. *See* Ex. 24, Frasier Dep. 58:22-59:7 ("[I]t's important that inmates be housed in a safe environment, period."); Ex. 27, Major Martin Dep. 20:8-21:23; 132:17-24 (jail is responsible for care, custody, and control of inmates, including suicide prevention as "critical part of ensuring inmate safety"; "[e]verybody's responsible for suicide prevention"); Ex. 32, Sergeant Wilson Dep. 41:25-43:2 (goal is care, custody, and control of inmates, including inmate safety and suicide prevention;[5] *see also* Ex. 39, Upchurch Dec. ¶42 (Pl. expert) (responsibility to prevent suicide "lies with everyone in a corrections facility"). District courts in Texas agree. *See Wright v. Tex. Dep't of Criminal Justice*, 2013 WL 6578994, at *3-4 (N.D. Tex. Dec. 16, 2013) ("confinement" and "safely hous[ing]" of inmates is "a program or service for ADA/[RA] purposes"); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 844 (S.D. Tex. 2014) (same); *McCollum v. Livingston*, 2017 WL 608665, at *38 (S.D. Tex. Feb. 3, 2017) (same).

Next, the record unquestionably shows that Hawkins had mental impairments, which Defendant cannot dispute. Doc. 194 at 15-18. From 2009 until his death in 2014, Harris County jail psychiatrists repeatedly diagnosed him with severe mental illnesses, including:

---

[5] *Accord* Ex. 28, Perkins Dep. at 7:15-18 (job duties of detention officer are "[c]are, custody, and control of inmates"); Ex. 29, Reyes Dep. at 7:22-25 (same); Ex. 21, Aguirre Dep. at 8:10-12 (same); Ex. 22, Cano Dep. at 10:18-25, 25:11-18 (same, and to "[w]atch over inmates"; "the role of the jailer in suicide prevention" is "[t]o make the inmates safe").

- Schizoaffective Disorder, Ex. 18, HC 4509; 6350; 6536; 6552; 6556; 6564; 6574; 6734; 6742;
- Bipolar Disorder, *id.* at HC 4342;
- Major Depressive Disorder, *id.* at HC 3613; 3617; 3620; 4342; 6876.[6]

Psychiatrists elsewhere, including Harris County MHMRA,[7] diagnosed him with these illnesses:

- Schizophrenia, Ex. 19, Smith 1761-64; 1765-69; 1840-43; 1851-58; 6307-08; 6339; 6388, 6389; Ex. 18, HC-4490-91;
- Schizoaffective Disorder, Ex. 19, Smith 1756-57; 1770-71; 1783-90; 1805-07; 1812; 1818; 1820; 1825-26; 1882-83; Ex. 18, at HC-3250;
- Bipolar Disorder, Ex. 19, at Smith 6340; 6512;
- Major Depressive Disorder, *id.* at Smith 1765-69; 1770-71; 1772-73; 1798-1800; 1833-35; 1840-43; 1844-45; 1851-58; 6344.

Hawkins' mother and sisters, who knew him well, saw the symptoms of his mental illnesses emerge in childhood and worsen in adulthood, including symptoms of delusions and voices in his head that were not real. Ex. 37, Smith Dec. ¶¶6-12 (recalling strange behaviors during Hawkins' childhood); *id.* at ¶¶16-20 (Hawkins' symptoms worsened after prison); Ex. 36, Milburn Dec. ¶7, 10, 20 (Hawkins had an imaginary friend, believed Beyoncé was his girlfriend, and heard voices in his head telling him to hurt himself); Ex. 37, Smith Dec. ¶20 (Hawkins had bouts of confusion and disorientation, and once wandered into a stranger's home thinking it was his own). They saw him seek mental health treatment for his impairments and take medication. *Id*. at ¶¶32-33; Ex. 34, Becks Dec. ¶12.

As Plaintiff's expert, psychiatrist Dr. Shane Konrad, explained, these various mental illnesses "manifested in symptoms of depression and psychosis," causing behavioral problems, auditory hallucinations and delusions, suicidal ideation, and self-injurious conduct. Ex. 35, Konrad Dec. ¶47. Dr. Konrad confirms that the records show Hawkins had numerous mental

---

[6] Hawkins' jail diagnoses and medication records also show that Harris County "regarded him" as having a mental impairment, which is another way to establish a disability. 42 U.S.C. 12102(1)(C).

[7] As mentioned earlier MHMRA was the jail's mental health care provider, *see* n. 2 *supra.*

impairments for which Harris County jail prescribed Hawkins medications, including antipsychotics, antidepressants, and mood stabilizers. *Id.* at ¶¶ 46, 55, 63, 68, 72, 76, 129; Ex. 15, HC 1903-64 (medication administration records).

Defendant's argument that Hawkins' diagnosis of "malingering"[8] negates his diagnosed illnesses is unsupported. Doc. 194 at 17. As Dr. Konrad explains, "a patient can concurrently have active serious psychiatric illness (such as schizoaffective disorder) and malingering." Ex. 35, Konrad Dec. ¶128.2. Defendant offers no evidence to contradict Dr. Konrad on this point. Therefore, Plaintiff has adduced evidence to show he had mental impairments.

Finally, Hawkins' numerous mental impairments substantially limited his ability to care for himself, as well as his ability to think, sleep, and concentrate, all of which are listed as "major life activities" under the ADA and RA. 42 U.S.C. § 12102(1)-(2); 29 U.S.C. 705(9).

First, Hawkins was unable to care for himself because the voices in his head impelled him to repeatedly attempt suicide. As Dr. Konrad explains, Hawkins illnesses caused him to have "poor insight, judgment, [and] coping skills," and diminished his "impulse control to protect himself from self-harm and suicidal behavior." Ex. 35, Konrad Dec. ¶25. His illnesses, and the voices they produced, gave him suicidal urges. *Id*. Thus, during his time in Harris County jail, Hawkins repeatedly reported voices in his head telling him to harm himself. *See, e.g.*, Ex. 1, HC 78 (psychiatric referral) ("[T]he voices in his head were telling him to hurt himself and that he is no good."); Ex. 2, 1474 (Mental Health Progress Note) ("[T]he [I]lluminat[i] is watching me and makes me want to kill myself.").[9] The voices did in fact drive him to attempt suicide. *See, e.g.*, Ex. 1, HC 64-65 (incident report and psychiatric referral for suicide attempt on January 17, 2014,

---

[8] "Based on the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM V), the essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives." Ex. 35, Konrad Dec. ¶128.

[9] *See also, e.g.*, Ex. 1, HC 64, 76, 79, 81, 88, 91, 95, 99, 126, 137, 148, 5601, 5623; Ex. 18, 3355, 4342; Ex. 4, 4293, 4297; Ex. 5, 4350-51; Ex. 19, Smith 6505, 6510, 6587.

during which he stated "he was hearing voices telling him that he needed to kill himself"); 126-133 (incident reports for single day in which he tried to hang himself three times; "I hear voices telling me to kill myself"). The same was true outside of jail, during his time at home. *See, e.g.*, Ex. 19, Smith 1652 (discharge from psychiatric center after trying to hang himself from ceiling fan after "the voices came back"); 6375 (admission to same center for attempted overdose, reporting "auditory hallucination that occurred a week ago 'telling [him] to hang [him]self'").

The Second Circuit has held that "[a] mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself" and is therefore "a protected disability under the [RA]." *See Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003).[10] Numerous district courts have reached the same conclusion. *See, e.g, Mileski v. Gulf Health Hosps., Inc.*, 2016 WL 1295026, at *15 (S.D. Ala. Mar. 31, 2016).[11] A Texas district court has similarly recognized the nexus between suicide risk and "caring for oneself," denying a motion to dismiss a claim that the prison had discriminated against an inmate, who suffered from bipolar disorder and schizophrenia, by failing to provide accommodations for his "known suicidal tendencies." *Wright*, 2013 WL 6578994, at *3-5.

The record evidence shows that Hawkins' mental illnesses substantially limited his ability to care for himself by "impel[ling him] to suicide." *Peters*, 320 F.3d at 168; *see also* 29 C.F.R. § 1630.2(j)(1)(i)-(ii) ("'Substantially limits' is not meant to be a demanding standard. . . . An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.").[12]

---

[10] The Sixth Circuit has done the same in looking to ADA and RA caselaw to analyze claims under the Tennessee Handicap Act, which was "enacted to prohibit discrimination in a manner consistent with federal civil rights law." *See Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 134 F. App'x 921, 925-26 (6th Cir. 2005).

[11] *See also Tracy v. Fin. Ins. Mgmt. Corp.*, 458 F. Supp. 2d 734, 741 (S.D. Ind. 2006); *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 180, 189-191 (D. Me. 2010); *Stokes v. City of Montgomery*, 2008 WL 4369247, at *5-6 (M.D. Ala. Sept. 25, 2008).

[12] Each case Defendant cites to argue that an increased risk of suicide cannot constitute a qualifying limitation is

Second, Hawkins' mental impairments additionally and substantially limited his ability to think, sleep, concentrate, and work, all of which qualify as "major life activities" within the meaning of the ADA. 42 U.S.C. § 12102; 29 U.S.C. § 705(9).

Hawkins' mother and sisters recall the voices and his delusions about Beyoncé and the Illuminati. His mother remembers that "[t]he voices in his head were awful," preventing him from thinking clearly. Ex. 37, Smith Dec. ¶¶18, 40, 47. They became worse as he grew older, and he couldn't make them leave him alone. Ex. 34, Becks Dec. ¶¶10, 11, 16-17, 22. He could barely interact with other people at times. Ex. 36, Milburn Dec. ¶¶10-11, 14-17, 19, 22, 24-25.

This substantial evidence leads to the unsurprising conclusion that Hawkins' mental impairments also kept him from being able to sleep, concentrate, and work. He repeatedly reported to jail staff that the voices in his head prevented him from achieving restful sleep, which, in turn, exacerbated his already-limited ability to think and to concentrate. *See, e.g.*, Ex. 18, HC 2235 (Mental Health Progress Note) (reporting visual hallucinations of black shadows at night, stating "I am still hearing voices, everyday all the time" and that he "stays up all night, and sleeps during the day"); HC 3355 (same) ("I feel demons on me when I sleep at night" and reporting voices telling him to kill himself).

---

distinguishable. In *Garza v. City of Donna*, 2017 WL 2861456, at *8 (S.D. Tex. July 5, 2017), the court simply stated that "a person's risk of suicide is not a life activity" and that it "is not at all clear what relevant [sic] major life activity is substantially limited by [substance addiction causing this risk]." Here, Plaintiff has provided the relevant major life activity. In *Steele v. Rowles*, 2009 WL 2905903, at *10 (E.D. Tex. Sept. 3, 2009), *aff'd*, 389 F. App'x 347 (5th Cir. 2010), the court granted summary judgment on the basis that "[t]he only evidence of a disability in the record is that [plaintiff] was suicidal on [a single date]" and that "temporary afflictions do not constitute a disability," circumstances not at all comparable to the case at bar. In *Martin v. Brown Schools Education Corporation*, 2003 WL 21077454, at *2 (N.D. Tex. Mar. 14, 2003), the court found the plaintiff had failed "to show how being 'suicidal' translates into a perceived impairment and to designate any major life activity in which she is substantially limited." Here, Plaintiff does not allege that "being suicidal" was Hawkins' impairment; his mental illnesses were his impairment. Plaintiff also identifies what major life activity is limited: caring for himself. Finally, in *Wade v. Montgomery County, Texas*, 2017 WL 7058237, at *6 (S.D. Tex. Dec. 6, 2017), the court simply cited to the three preceding cases in holding that "allegations of suicidal risk are not sufficient, without more, to show that an impairment is disabling." It made no mention of the "caring for oneself" language under the ADA and RA.

His family also noticed his inability to sleep peacefully. *See* Ex. 37, Smith Dec. ¶26 (he had "trouble sleeping" and "I think he really just didn't want to be alone with his thoughts"); Ex. 36, Milburn Dec. ¶13. In addition, his family noticed his illnessness made him unable to concentrate on tasks or even in conversations. *See* Ex. 37, Smith Dec. ¶¶24 ("One time, he forgot how to pump gas . . . [h]e couldn't focus long enough to do basic tasks correctly."); *id.* at ¶¶ 27, 41; Ex. 34, Becks Dec. ¶¶9, 11; Ex. 36, Milburn Dec. ¶¶15, 16; *see also* Ex. 8, HC 4342 (Harris County staff observed Hawkins to be paranoid, confused, and believe he was someone else). Finally, his family witnessed that as his illness worsened, it prevented him from keeping full-time employment, staying on a schedule, and even maintaining daily hygiene. *See* Ex. 37, Smith Dec. ¶¶24-25, 27-31; *see* also Ex. 18, HC 6350, 6536 (Harris County staff observed Hawkins to have poor hygiene and disheveled appearance). This evidence establishes his impairments substantially limited his ability to think, concentrate, sleep and work.

Defendant asserts because Hawkins was able to read, write, express himself, and periodically hold a job, he was not "substantially limited" in any major life activity. Doc. 194 at 17. This ignores the ADA's plain text: "An impairment that substantially limits one major life activity need not limit other major life activities . . . to be considered a disability." 42 U.S.C. § 12102(4).[13] Accordingly, Hawkins was a "qualified individual with a disability." *Id.* at § 12131.

### III. Harris County Failed to Accommodate Hawkins' Disabilities and Limitations

Harris County subjected Hawkins to discrimination by denying him services provided to every inmate—namely, safe housing and adequate monitoring—and by failing to reasonably accommodate his disabilities. *See* 42 U.S.C. 12132; *see* Part I *supra*.

---

[13] Even an "episodic" or "in remission" impairment is a "disability" under the ADA "if it would substantially limit a major life activity when active." *Id.*

A.     **Applicable Law**[14]

Title II "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson*, 431 F.3d at 454 & n.11. "Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003). As discussed earlier, in the prison or jail context, the provision of safe confinement is one such benefit. Ex. 27, Martin Dep. 20:8-21:23; 132:17-24 (jail is responsible for care, custody, and control of inmates, including "suicide prevention" as "critical part of ensuring inmate safety"; "[e]verybody's responsible for suicide prevention"); *Wright*, 2013 WL 6578994, at *3-4; *Hinojosa*, 994 F. Supp. 2d at 844; *McCollum*, 2017 WL 608665, at *38; Part II *supra*.

"A critical component of a Title II claim for failure to accommodate . . . is proof that the disability and its consequential limitations were known by the [entity providing public services]." *Windham v. Harris Cty., Tex.*, 875 F.3d 229, 236 (5th Cir. 2017) (citation omitted). "When a plaintiff fails to request an accommodation . . . he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* at 237 (citation omitted). "[T]he ADA requires [public entities] to reasonably accommodate limitations, not disabilities." *Id.* at 236 n.10.

A plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). Accordingly, once the plaintiff has "suggest[ed] the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . he has made out a *prima facie*

---

[14] Caselaw analyzing failure-to-accommodate claims under Title I of the ADA is applicable to failure-to-accommodate claims under Title II. *See Windham v. Harris Cty., Tex.*, 875 F.3d 229, 236 & n.6 (5th Cir. 2017).

showing that a reasonable accommodation is available." *Val Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 752 (N.D. Tex. 2014) (citations omitted); *accord Harkless v. Brazoria Cty., Tex.*, 2016 WL 1702595, at \*4 (S.D. Tex. April 28, 2016). The defendant may then attempt to show "that the accommodation generally would not be reasonable" or it may "move[] on to the affirmative defense" of "undue hardship." *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1058 (5th Cir. 1997) (citing *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683-84 (5th Cir. 1996)). "[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense." *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 502 n.20 (5th Cir. 2001). The inquiry into undue hardship "turns the focus" from the facial reasonableness of an accommodation to the plaintiff's "specific circumstances," i.e., "the hardships imposed . . . in the context of the particular [defendant's] operations." *Riel*, 99 F.3d at 683-84. Both reasonableness and undue hardship are questions for the jury. *See id.*

   B.   **Harris County Failed to Accommodate Hawkins' Limitations at Every Level**

   Hawkins' suicide was not inevitable. His disabilities, limitations, and required accommodations were open, obvious and apparent. Harris County could have reasonably accommodated his limitations but failed to do so.

      1.   **Hawkins' Disabilities and Limitations Were Open, Obvious, and Apparent**

   Hawkins' disabilities and limitations—his inability to protect himself from suicide and self-harm due to his mental illnesses—were open, obvious and apparent from his jail history, contained in his "classification file." This file, which jail classification staff maintained and were required to take into account in choosing where to house Hawkins, included his incident reports,

prior conduct, staff observations, mental health referrals, caution text,[15] and history of prior suicide attempts. Ex. 30, Summerlin Dep. at 25:4-29:7; 31:7-33:16; 57:15-60:1.[16]

For example, Hawkins repeatedly reported voices telling him to kill himself, took suicidal steps, and attempted suicide in jail. From July 14, 2009, to January 17, 2014,[17] Harris County housing officers generated offense reports and mental health referrals for at least **25** such incidents, and each was brought to the attention of a classification officer.[18] Ex. 1, HC 64-166. In at least 11 of them, officers reported Hawkins hearing voices telling him to kill or hang himself. *E.g.*, *id.* at HC 148-50 (9/25/2009).[19] In at least 9 of them, officers found Hawkins with a bed sheet or pant-leg tied around his neck. *E.g.*, *id.* at HC 139-40 (6/14/2009).[20] And in at least another 9, he attempted suicide. *E.g.*, *id.* at HC 151 (9/26/2009).[21]

Three of these suicide attempts occurred in his last ten months alive,[22] and one was identical in method to his final and successful attempt. First, on April 13, 2013, Officer Cano found Hawkins with a bed sheet wrapped around his neck and the other end tied to the smoke detector, leaning forward with his eyes closed. *Id.* at HC 73-75. The knot around Hawkins' neck

---

[15] "Caution text is an entry made by classification to document certain events" on an inmate's record. Ex. 30, Summerlin Dep. 31:8-11; Ex. 11, HC 5836-5844 (nine pages of Hawkins' caution text listing dozens of referrals to the MHU, various attempted suicides and incidents of self-harm, and that he had mental health issues).

[16] It is therefore immaterial that "[j]ail classification [did] not have access to [Hawkins'] medical or mental health records." Doc. 194 at 7. Furthermore, "it is possible for mental health staff and correctional staff to collaborate in a substantive manner" without running afoul of confidentiality requirements. Ex. 35, Konrad Dec. ¶150.

[17] Hawkins was in Harris County jail from mid-2009 to mid-2011 and then July 2012 until his death in February 2014. Ex. 10, HC 5835 (booking history).

[18] Classification staff handle all inmate housing assignments, including when inmates are discharged from the jail's Mental Health Unit. Ex. 30, Summerlin Dep. 32:25-33:16. "Housing" staff, also known as "security" or "detention" staff, are responsible for monitoring the inmates and activities in the housing units. *Id.* at 29:8-10, 29:18-21.

[19] Ex. 1, HC 126-33 (6/22/2010); 137-138 (4/12/2011); 99-101 (6/28/2011); 91-94 (9/22/2012); 76-77 (5/1/2013); 78 (9/18/2013); 79-80 (10/2/2013); 81-83 (10/5/2013); 88 (10/31/2013); 64-65 (1/17/2014).

[20] Ex. 1, HC 141-43 (6/28/2009); 151 (9/26/2009); 126-133 (6/22/2010); 96-98 (6/26/2011); 73-75 (4/13/2013); 88 (10/31/2013); 89-90 (11/17/2013); 64-65 (1/17/2014). *See also id.* at HC 123-125 (4/29/2010) (found with bed sheet hidden under his clothes after reporting he was feeling suicidal); 84-85 (10/16/2013) (contacted officers via intercom and stated "I want to kill myself. I'm going to cut myself with a spoon" and was referred to mental health).

[21] Ex. 1, HC 126 (6/22/2010, 7 AM), 128 (6/22/2010, 10:40 AM), 132 (6/22/2010, 3:05 PM), 134 (7/14/2010); 103 (6/29/2011); 73-75 (4/13/2013); 54, 5524 (7/28/2013); 64-65 (1/17/2014).

[22] The other six incidents occurred between September 26, 2009, and June 29, 2011, and each involved Hawkins attempting to hang himself by either his pants, bed sheet, or in one instance, his suicide blanket.

was too tight to untie so Cano had to lift him by his armpits, at which point he "opened his eyes and muttered 'I don't want to live no more.'" *Id.* at HC 73. Cano would go on to again find Hawkins, less than a year later, "hanging in exactly the same way." Ex. 22, Cano Dep. 98:12-99:1; Ex. 1, HC 66. Second, on July 28, 2013, officers found Hawkins "passed out beneath his bunk w/ vomit in lock down for [an] unknown period." Ex. 1, HC 54, 5524. He had attempted suicide by overdose after hoarding his prescription medication, resulting in his near-death and month-long admission to Lyndon B. Johnson Hospital. *See* Doc. 194 at 6 & n.39. And finally, on January 17, 2014, officers found Hawkins with one end of a sheet tied around his neck, saying he heard voices telling him to kill himself, attempting to tie the other end to the top rail of the cellblock. Ex. 1, HC 64-65. He was admitted to the MHU and released on January 31, 2014, five days before his suicide. *Id.*; Ex. 9, HC 4574-75.

As Defendant's own jail-suicide prevention consultant Lindsay Hayes explains, the strongest indicators of suicide risk in the correctional setting are communication of suicidal "intent some time prior to death," "a history of one or more suicide attempts," "prior histories of mental illness and suicidal behavior," and confinement in special housing like Ad Sep. Ex. 41, Hayes Rep. at 12-13;[23] *accord* Ex. 39, Upchurch Dec. ¶32 ("My opinion, which I think would be shared by the majority of correction professionals, is that prior suicide attempts strongly indicate an increased risk of a future suicide attempt."); Ex. 35, Konrad Dec. ¶¶133-35 (reviewing Hawkins' risk factors for suicide, including prior attempts; "one of the best indicators of future behavior is past behavior"). Hawkins' record reflected multiple instances of *all* these factors, as

---

[23] Mr. Hayes was commissioned by the Harris County Sheriff's Office in mid-2014 to assess Harris County jail's suicide prevention policies. Ex. 41, Hayes Rep. at 3. He developed his protocols to be consistent with standards promulgated by the American Correctional Association, the National Commission on Correctional Health Care, and the Department of Homeland Security. *Id.* at 6. He reviewed 7 jail suicides, toured the facility, interviewed officials, and reviewed policies, procedures, protocols, and training materials. *Id.* at 3-4. Plaintiffs' experts reviewed Mr. Hayes' Report, found it to be based on sound methodology, and incorporated it into and as supporting their own opinions. Ex. 39, Upchurch Dec. at 11, ¶¶33, 36, 79-86; Ex. 35, Konrad Dec. ¶¶19, 80, 114-16.

well as a clear and accelerating pattern of him hearing voices, making suicidal gestures, and attempting suicide. He was an "outlier," "red-zoned" inmate "at constant danger," *see* Ex. 26, Konrad Dep. 214:19-24, with a "history of numerous serious suicide attempts with high intent and high potential for lethality," Ex. 35, Konrad Dec. ¶135. "There is no question that Harris County jail staff were aware of [Hawkins'] history of repeated suicide attempts and suicidal behavior and that he had an elevated level of suicide risk." Ex. 39, Upchurch Dec. ¶32; Ex. 35, Konrad Dec. ¶¶28, 133-35 (Harris County knew his chronic and acute suicide risk factors).

As set forth below, each of Defendant's failures to provide obvious and life-saving accommodations violated the ADA and RA. At the least, genuine issues of disputed material fact exist on each issue, warranting trial.

## 2. Harris County Failed to Reasonably Accommodate Hawkins by Replacing His Bed Sheet with a Suicide Blanket

On January 31, 2014, when he was discharged from the MHU, jail classification officers placed Hawkins in an Ad Sep cell, without any restrictions. *See* Ex. 8, HC 4542 (housing history); Ex 9, HC 4574 (transfer sheet). Harris County knew from Hawkins' history that he was likely to use his bed sheet to tie a noose around his neck and tie it to the smoke detector, as he had done in April 2013. *See* Ex. 1, HC 73-75. On other occasions he had tied a bed sheet around his neck, or attempted to hang himself by his bed sheet. *E.g.*, *id.* at HC 64-65.[24] "[I]t would have been open, obvious, and apparent to any reasonable corrections professional that he should not have been housed in a cell with a sheet and that kind of covered smoke detector." Ex. 39, Upchurch Dec. ¶44. "[E]ven a layperson . . . might say, wait a minute . . . you want us to house him in the exact same cell with a bed sheet where we almost had him kill himself a few months ago? That seems unsafe to me." Ex. 26, Konrad Dep. 171:3-13; Ex. 35, Konrad Dec. ¶30 ("No

---

[24] Ex. 1, HC 88, 89, 96, 103, 141-43, 151

reasonable jail official" would give Hawkins access to a bed sheet given the jail's knowledge of the smoke detector, his mental illnesses, elevated suicide risk, and past recent suicide attempts).

Harris County should have accommodated Hawkins by replacing his bed sheet with a suicide blanket, but it did not. Doc. 194 at 2; Ex. 1, HC 66-67 (incident report); Ex. 22, Cano Dep. 98:12-99:1. A "suicide blanket," is a special blanket "that [inmates] cannot hang themselves with or hurt themselves with." Ex. 25, Huerta Dep. 55:6-10; Ex. 26, Konrad Dep. 56:6-13 (describing a suicide blanket as made of "more of a firm . . . or heavy fabric" so that inmates "can't tie it in any type of ligature, or . . . tie it around [their] neck or tie it to things"). Harris County had suicide blankets and chose not to give him one. This was an obvious accommodation that was facially reasonable and neither costly nor burdensome. Harris County's failure to replace his bed sheet violated the ADA and RA. In fact, only months after Hawkins' death, Harris County changed its Suicide Prevention Policy to require that "suicide blankets will be maintained on each housing floor," perhaps in recognition of the obvious accommodation that should have been given to Hawkins but was not. *Compare* Ex. 13, HC 11, *with id.* at HC 272-74.

Defendant's arguments on this point lack merit. First, Defendant implicitly argues that a suicide blanket would have left Hawkins cold. Doc. 194 at 24. As Dr. Konrad testified, however, a suicide blanket "serves the purpose of providing warmth as a blanket would but prevents self-harm." Ex. 26, Konrad Dep. 56:11-13. Second, Defendant argues that Harris County strove to "house[] inmates in the least restrictive means necessary," and therefore did not replace his regular bed sheet with a suicide blanket. Doc. 194 at 24. Defendant has no evidence to show that a suicide blanket is "more restrictive" or less desirable than a bed sheet. Moreover, 28 C.F.R. § 35.152, which Defendant cites, Doc. 194 at 24 & n.159, and which states that "public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting

appropriate," does not limit entities' discretion to make appropriate reasonable accommodations to save an inmate's life. As Dr. Konrad testified, while the better choice would have been not to house Hawkins in administrative separation, "the next best option if there was nowhere else to go would be use a security—a suicide blanket." Ex. 26, Konrad Dep. 239:18-22.[25]

### 3. Harris County Failed to Reasonably Accommodate Hawkins by Modifying The Cell Smoke Detector to Prevent Him from Using it as a Tie-Off Point

For the same reasons it was obvious that Hawkins should not have been permitted a standard bed sheet, it was obvious his smoke detector should have been modified. He had used it as a tie-off point in a previous identical suicide attempt. *See, e.g.*, Ex. 39, Upchurch Dec. ¶44 (given Hawkins' "suicide attempt history, especially involving the sheet and smoke detector present in his cell the day he died" it was obvious that "he should not have been housed in a cell with a sheet and that kind of covered smoke detector"); Ex. 35, Konrad Dec. ¶144 (when there has been a "documented suicide attempt by hanging from a smoke detector," the expectation is that jail staff would seek out ways to modify it "to reduce or remove the safety risk").

The smoke detector in Hawkins' cell had a protruding head with holes through which Hawkins had previously laced a bed sheet to thread a noose to hang himself. *See* Ex. 1, HC 73-75; Ex. 17, HC 240 (photo of detector). Plaintiff's correctional expert Upchurch testified that he had seen "conically shaped sprinkler heads[26] that are impossible to tie to" as well as detectors covered with "fine mesh" too small to thread a noose through. Ex. 31, Upchurch Dep. 101:21-

---

[25] Defendant string-cites five cases without parentheticals for the proposition that restricting Hawkins' bed sheet would likely violate his constitutional rights "in the absence of suicidality." Doc. 194 at 24 n.159. Those cases are inapposite. First, all involved the denial of bed sheets to inmates during the winter and whether exposure to cold in those circumstances could constitute "punishment" under the Eighth or Fourteenth Amendments—an entirely different legal question. Second, Plaintiff's expert testified, uncontested, that a suicide blanket provides warmth. Third, it would not be arbitrary to remove a bed sheet from an inmate who had used bed sheets many times in past attempts to kill themselves. Fourth, Hawkins' history was replete with indicators of "suicidality." Part III.B.1 *supra*.

[26] Mr. Upchurch referred to both sprinklers and smoke detectors in his responses to Defendant's counsel's questions about Hawkins' smoke detector. Mr. Upchurch's declaration makes it clear that the modifications discussed in the text are applicable to smoke detectors, heat detectors, and sprinklers. Ex. 39, Upchurch Dec. ¶35.

102:6; Ex. 39, Upchurch Dec. ¶35 ("Many jurisdictions recognize the risk of tie off points" and thus modify smoke detectors using these modifications or by recessing the covers). Defendant's own suicide-prevention consultant Hayes, after examining the jail's Ad Sep cells, concluded they "were *not* suicide resistant" because the unmodified smoke detector cages "could act as an anchoring device" in a suicide by hanging, and recommended the same modifications. Ex. 41, Hayes Rep. at 22-23, 49 (smoke detectors should be flush with the ceiling or be covered with "security screening mesh" or similar covering not "large enough to thread a noose through").

Defendant's arguments on this issue each miss the mark. First, Defendant asserts that because Mr. Upchurch had not personally inspected the smoke detectors in the Harris County jail he "had no idea whether there is a 'suicide-resistant' modification that works with the smoke detectors or would be approved by the State of Texas." Doc. 194 at 23 & n.153. In fact, Mr. Upchurch saw photos of the Harris County jail smoke detector prior to his deposition, Ex. 39, Upchurch Dec. 11, Ex. 31, Upchurch Dep. 10:14-19, and when asked if his suggestions would comply with Texas law, replied "I have no idea" but "[i]f [the smoke detector] function[s] . . . I see no reason why they would not," *id.* at 103:6-9. Upchurch was correct. Nothing in the Texas Administrative Code cited by Defendant suggests that any of the modifications Upchurch identified would run afoul of its requirements. *See* Tex. Admin. Code § 263.31 (stating merely that "fire detection for inmate occupied areas shall be by means of listed and labeled smoke detectors . . . so located to meet the smoke detection testing criterion of Section 263.51(f)"); *id.* at § 263.51(f) (setting out methodology for testing smoke management systems).[27]

Defendant further claims that "Harris County's suicide prevention committee, who met shortly after Hawkins'[] suicide, researched whether any alternatives existed to the smoke

---

[27] Furthermore, the ADA is duly-enacted federal law and thus supersedes Texas state laws which might otherwise conflict with its requirements. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015). It is not, however, necessary to rest on this argument.

detectors used in the Harris County jail and concluded there were no reasonable alternatives." Doc. 194 at 23. Defendant relies entirely on Major Martin's testimony for this point, in which he stated that he spoke to "some of the people that took part in that meeting" and "[t]hey said they did look for other types of smoke detectors and didn't really find anything that they felt would do a better job." *Id.*; Ex. 27, Martin Dep. 118:11-119:4. This uncorroborated hearsay provides no detail as to what the committee considered, the expenses involved, or why it reached—if it did— that decision. This merely highlights Harris County's failure to address how or why any of these low cost, life-saving alternatives would have imposed an undue hardship.

Accordingly, Plaintiff has "'suggest[ed] the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits,'" *see Val Velzor*, 43 F. Supp. 3d at 752, and Defendant has provided no rebuttal. A jury should be allowed to determine whether Harris County failed to reasonably accommodate Hawkins' needs by failing to modify his smoke detector.

### 4.    Harris County Failed to Reasonably Accommodate Hawkins by Removing the Towel Covering His Window

Harris County knew that given Hawkins' history of jail suicide attempts, observing and monitoring him was critical to preventing his suicide. *See* Ex. 39, Upchurch Dec. ¶42 ("Monitoring and observation [are] critical to ensuring the safety and well-being of inmates" and to "help dissuade those contemplating [suicide] . . . and to minimize the opportunities to carry it out."); *accord* Ex. 24, Frasier Dep. 56:11-25 (Def. expert) (monitoring inmates at an increased risk of suicide more closely is important; "as a general proposition, yes, you watch people. You try and keep [inmates] from . . . some sort of self-harm but the other premise [is] that quite frankly if they do self-harm that you can react quicker.").[28] Yet Harris County failed to do so.

---

[28]*See also* Ex. 41, Hayes Rep. at 24-25, 35 ("In inmate suicide attempts, the promptness of the response is often

To begin with, the administrative separation pod in which Hawkins was housed allowed officers inside the "pod control center" ("PCC") a line-of-sight to each cell, in order to enable constant, direct observation. *See* Ex. 13, HC 306 ("[P]od construction and/or cameras allow for continuous, nearly unobstructed view of the inmates and their living areas" and "PCC personnel shall be continually vigilant monitoring all housing areas."); Ex. 17, HC 222, 225, 226, (photos of PCC); *id.* at Smith 7238-39, 7240, 7263-64 (photos showing positioning of PCC relative to Hawkins' cell, 2J2-R); Ex. 22, Cano Dep. 19:4-8; 30:15-31:4 (explaining 2J1 and 2J2 cellblocks are together considered one "pod," and that he could see all the cells in the pod from the PCC). Observing the inmates was "part of [the] job in the [PCC]." Ex. 28, Perkins Dep. at 33:22-24; Ex. 27, Martin Dep. 107:6-15 (officers are responsible for monitoring inmates from PCC for behaviors indicative of a suicide attempt, which is "a continual process"). At least one officer was required to stay in the PCC at all times. *See, e.g.*, Ex. 22, Cano Dep. 30:5-14.[29]

Even a simple glance from the PCC would have allowed any officer inside to see Hawkins as he climbed up on his bed or table to tie a noose and hang himself from the smoke detector in 2J2-R. Ex. 17, Smith 7238-40, 7263-64 (photos showing positioning of PCC relative to Hawkins' cell, 2J2-R, and view from PCC directly into 2J2-R cell window); *id.* at Smith 7210-13 (photos showing area above bed and table and beneath smoke detector, where bed sheet and Hawkins' hanging body should have been visible, were both directly in line of sight through 2J2-R cell window). Defendant officers no evidence to contest this.

But on the night of his death, Hawkins covered his window with a towel and obstructed that view, as Defendant admits. *See* Doc. 194 at 2. Had Harris County jail staff *simply followed*

driven by the level of supervision afforded the inmate" and "[f]ollowing a suicide attempt, the degree and promptness of intervention provided by staff often foretells whether the victim will survive.").

[29] *Accord* Ex. 21, Aguirre Dep. 28:14-25; Ex. 28, Perkins Dep. 21:12-16; 32:25-33:4; Ex. 29, Reyes Dep. 54:8-17.

*their own written policies and training* they would have immediately noticed this obstruction and ordered Hawkins take it down, but they did not. Ex. 13, HC 306 (PCC personnel are to be "continually vigilant); *id.* at HC 288-90 ("At no time shall hanging towels be allowed to interfere with or hinder the view of staff"; officers shall inspect cellblocks for blocked windows and "[a]ny discrepancies found shall be . . . [i]mmediately rectified"); Ex. 27, Martin Dep. 102:8-19 ("Inmates are not allowed to cover the window on their administrative separation cell doors. . . [s]o that the [housing officers] can observe the inmate's actions and so that they can ensure the inmate is, you know, not trying to harm himself."); Ex. 29, Reyes Dep. 65:5-25 (officer in PCC should alert officer doing rounds to covered window); Ex. 28, Perkins Dep. 55:12-21 (officer in PCC would be able to tell if any window in pod was covered).[30]

Hawkins' towel was up for at *least* the amount of time it took him to tear his bed sheet, tie it around his neck, climb on his bed or table to reach the smoke detector, and secure the bed sheet to the smoke detector, plus the "five to six minutes" it took for him to die from asphyxiation. *See* Ex. 41, Hayes Rep. at 24. The officers on shift that night, from 2 p.m. to 10 p.m., were Reyes and Perkins. Ex. 6, HC 6888-89 (daily observation log); Ex. 29, Reyes Dep. 88:3-9; Ex. 28, Perkins Dep. 56:18-57:13. The officers who replaced them for the 10 p.m. to 6 a.m. shift were Cano and Aguirre. Ex. 22, Cano Dep. 68:15-69:5; Ex. 21, Aguirre Dep. 11:2-7; 28:5-9; Ex. 6, HC 6888. Cano found Hawkins' body at 10:10 p.m. Ex. 1, HC 66-67. Yet none of them—not Reyes, Perkins, Cano or Aguirre—ordered Hawkins to take the towel down.

Three former Ad Sep inmates housed in 2J2 at the same time as Hawkins declared under penalty of perjury that officers commonly allowed the windows to be covered, sometimes for hours, and sometimes even after conducting rounds; one inmate further remembers that Officer

---

[30] *See also* Ex. 41, Hayes Rep. at 47 (to safely house suicidal inmate, windows in cell doors "should *never* be covered (even for reasons of privacy, discipline, etc.)); Ex. 31, Upchurch Dep. 95:2-15 (the towel meant "you can't monitor . . . at all" and the officer in the PCC should have [immediately] seen that [the window] was covered");

Perkins, upon being told Hawkins' window was covered that night, responded "I don't care." *See*
Ex. 38, Sowders Dec. ¶9; Ex. 40, Williams Dec. ¶¶6, 9-10 12; Ex. 33, Bartholomew Dec. ¶9; *see
also* Ex. 21, Aguirre Dep. 30:24-31:8. Thus, not only did Reyes and Perkins fail to order
Hawkins to remove the towel or check on him, but for ten minutes at the top of their shift, before
Cano found him hanging, Cano and Aguirre did the same.[31] Had any of them followed Harris
County policies, Hawkins would be alive.

Instead, by the time medical personnel arrived five minutes after Officer Cano found
Hawkins' body, he was already "cold to the touch," *see* Ex. 18, HC 1815, and fifteen minutes
later, upon arrival at the medical clinic, could not be intubated due to the onset of rigor mortis,
*see id.* at HC 1810. Had any of the four officers ordered him to uncover the window, and then
observed his cell as required by policy, they would have prevented his suicide. There is no
colorable argument this would not have been facially reasonable or posed an undue hardship.

5.    **Harris County, Through the Actions of Chelsea Ford, Failed to Reasonably
      Accommodate Hawkins' Limitations by Increasing Monitoring and
      Referring Him to the MHU After His Suicidal Statement on February 4**

Harris County failed Hawkins through the actions of Chelsea Ford. On February 4, 2014,
the day before he killed himself, Ms. Ford, an LPHA intern,[32] visited Hawkins during her twice-
weekly administrative separation rounds, during which she did a brief check on all Ad Sep
inmates in a cellblock. *See* Doc. 194 at 12 n.85; Ex. 2, HC 1474; Ex. 23, Ford. Dep. 17:14-20;
42:23-43:4; 44:10-19; 46:17-47:8. He told her he had just been discharged from the MHU after
being admitted for trying to hang himself. Ex. 2, HC 1474. He also told her that "the
[I]lluminat[i] is watching me and makes me want to kill myself." *Id.*; Ex. 23, Ford Dep. 111:3-

---

[31] Indeed, Cano testified that rather than order Hawkins to remove his towel, he simply knocked on the window to
ask if Hawkins "was ok.". Ex 22, Cano Dep. 89:11-89:24 (also admitting that inmates covered their cell windows to
urinate or use the restroom or shower).
[32] LPHA stands for "Licensed Practitioner of the Healing Arts." Chelsea Ford had a master's degree in counseling
and had to sit for the National Counseling Exam to obtain her LPHA license. Ex. 23, Ford Dep. at 30:25-31:22.

113:21. Despite this, Ms. Ford "made her notes and moved on." Doc. 194 at 13. She did not inform the housing officers[33] escorting her of Hawkins' suicidal statements, nor did she refer Hawkins to a psychiatrist. *See* Ex. 23, Ford Dep. 80:21-81:4; 112:25-113:16; 119:8-120:11. Had she taken these steps, jail personnel would have monitored Hawkins more closely until he was seen by a psychiatrist, and he would not have been able to kill himself the next day. Furthermore, his explicit statement that the voices in his head made him want to kill himself directly contradicts Defendant's assertion there was no "behavior or statement[] that would indicate [Hawkins] was suicidal" in the five days between his release from the MHU and his death. *See* Doc. 194 at 14.[34] He gave a glaring warning of his suicidal intent. Ex. 35, Konrad Dec. ¶32.

Hawkins' disabilities, limitations, and required accommodations were open, obvious, and apparent to Ford. She knew Hawkins, having "rounded" on him numerous times. Ex. 23, Ford Dep. 98:22-24; 99:25-100:9; 101:21-103:7; Ex. 2, HC 1314-46. She knew he had attempted suicide several times in the past, with at least one nearly fatal overdose requiring an "extensive hospital stay." *Id.* at 102:12-103:13, 115:3-17; Ex. 2, HC 1474. She knew he was mentally ill and had delusions and she had access to his medical chart, which included notes from psychiatrists, LPHAs, and nurses. Ex. 23, Ford Dep. 92:4-93:9; Ex. 25, Huerta Dep. 66:24-67:23; 132:6-20.[35]

"[N]o reasonable jail employee in Ms. Ford's position would have failed to ask additional questions about [Hawkins'] suicide-related statement," alert jail personnel to his risk of self-harm, and refer him to a psychiatrist. Ex. 35, Konrad Dec. ¶32. Moreover, the contractual

---

[33] Chelsea Ford refers to these housing officers as "security staff" in her deposition but that is a synonym for housing officers. *See* Ex. 30, Summerlin Dep. 29:8-21. Plaintiff uses the term "housing officer" here to maintain consistency with the terminology used in this brief.

[34] Harris County did not need any further warnings of Hawkins' suicide risk, given his prior attempts and ongoing hallucinations instructing self-harm. *See* Part III.B.1, *supra*. To the extent there was any doubt about his suicidality abating between January 31 and February 5, his statement of February 4 eliminated that doubt.

[35] *Accord, e.g.*, Ex. 2, HC 1354 (Ford noting that she would check Hawkins' chart). Hawkins' chart included his diagnoses, suicide attempts, complaints of hearing voices telling him to kill himself, and substantial antipsychotic-, antidepressant-, and mood stabilizer-regimes. *See, e.g.*, Ex. 18, HC 45-63, HC 1429, HC 1479, HC 1817, HC 1845, HC 1848, HC 1864, HC 2615-16, HC 3108, HC 3126.

agreement between Harris County and MHMRA, as well as MHMRA's own policies, required Ford to report this statement to her MHU superiors. First, the agreement required "all MHMRA Providers providing services under this Agreement to follow the administrative policies, procedures, rules, and regulations of the Sheriff and/or County, including but not limited to those for security." Ex. 16, HC 4426. In turn, Harris County's Suicide Prevention Policy mandated that "[a]ny Staff member"—including, under the agreement, Chelsea Ford—"observing behavior indicative of a mental health issue *shall* document same on the Referral for Psychiatric Screening form and forward it to his/her immediate supervisor for review and processing." *See* Ex. 13, HC 272 (emphasis added). The policy further required that "[f]ollow-up review . . . be done immediately by MHMRA." *Id.* The purpose of these requirements was "to ensure inmates with mental health issues are recognized and addressed in a timely, professional manner." *Id.* Second, MHMRA's administrative separation policy required Ford "obtain mental health services for all inmates requiring such services." Ex. 14, Smith 6258.

Harris County stated that it was every staff member's responsibility to prevent suicide. Ex. 27, Major Martin Dep. 132:17-24 ("Everybody's responsible for suicide prevention"); *accord* Ex. 32, Sergeant Wilson Dep. 41:25-43:2 (goal as sergeant was care, custody, and control of inmates, including suicide prevention as aspect of inmate safety); Ex. 22, Cano Dep. 25:11-18 ("[T]he role of the jailer in suicide prevention" is "[t]o make the inmates safe."). Ford's failure to alert deprived Hawkins of this additional protection, in violation of both policies.

Defendant does not argue, nor could it, that alerting housing personnel and referring Hawkins to a psychiatrist would have posed any undue financial or administrative hardship. Ford had in the past alerted housing personnel to inmates who posed a risk of suicide. Ex. 23, Ford Dep. 80:21-81:4. Had she done so, housing officers, acting according to Harris County policy,

would have monitored him more closely, or constantly, until he was taken to the MHU for assessment. Ex. 27, Martin Dep. 78:6-19; Ex. 13, HC 273. Ford also admitted that referring inmates who made suicidal statements to psychiatrists was within her duties, and she was authorized to report Hawkins' statement to the outpatient mental health clinic, so that a physician or nurse practitioner ("prescriber") could promptly assess him and take necessary steps. *See* Ex. 23, Ford Dep. 52:6-53:10; 56:7-57:1; 70:2-18; 80:21-81:4. After assessment, and as warranted, the prescriber would have admitted Hawkins to the MHU itself, as they had many times before. *See id.* 70:2-18; Ex. 9, 4543-75. Given the evidence on this issue, the Court should allow a jury to decide whether her inaction constituted a failure to accommodate Hawkins' obvious needs.

Defendant incorrectly asserts that Ford's inaction is not attributable to Harris County because she was an employee of an independent contractor, MHMRA. Doc. 194 at 14 & n.92. However, the ADA does not allow Harris County to "contract away [its] liability by partnering with private entities to perform certain services." *See Wilkins-Jones v. County of Alameda*, 859 F. Supp. 2d 1039, 1045–46 (N.D. Cal. 2012); 28 C.F.R. § 35.130(b)(1)(i) ("A public entity, in providing any aid, benefit, or service, may not, directly *or through contractual*, licensing, or other arrangements . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." (emphasis added)); *see also, Castle v. Eurofresh, Inc.*, 731 F.3d 901, 909-910 (9th Cir. 2013) (Arizona state prison could be held liable for disability discrimination by private contractor providing paid labor and vocational training to inmates, even though prison had no authority to control the contractor's allegedly discriminatory actions).[36] Defendant does not acknowledge this caselaw or the regulations.

---

[36] *See also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1066 (9th Cir. 2010) ("That a public entity has contracted for the provision or occurrence of . . . services, programs and activities seems sufficient to make them 'the services, programs, or activities' of that entity."); *accord Phillips v. Tiona*, 508 F. App'x. 737, 753 (10th Cir. 2013); *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, 2017 WL 4791185 at *10-11 (E.D. La. Oct. 24, 2017); *Kerr v. Heather Gardens*

Here, Harris County contracted with MHMRA to provide the critical services and benefits of mental health care to inmates. *See* Ex. 16, HC 4423 (Harris County-MHMRA Interlocal Agreement). This included the provision of LPHA interns like Ford to monitor inmates for mental health issues, including suicide risk, during administrative separation rounds. Doc. 194 at 14; Ex. 23, Ford Dep. 41:8-11; 42:16-22; 46:17-47:15. The mental health services provided by MHMRA, under contract with Harris County and for the benefit of Harris County jail inmates, were therefore services provided by Harris County. Accordingly, even though MHMRA employed Ford, Defendant is liable for her actions and omissions.

Defendant further claims that Ford's inaction constituted "a medical treatment decision" outside the ambit of the ADA. Doc. 194 at 9-10, 13. Defendant is wrong.

First, Ford's inaction was not a "medical treatment" decision. As an LPHA intern conducting Ad Sep rounds, she was not treating inmates; rather she was monitoring inmates' mental health statuses, for purposes of safety and for potential referrals to a prescriber.[37] Ex. 23, Ford Dep. 40:9-25 (duties were counseling and case management; she had no duties relating to medication, substance use, or cognitive behavioral counseling); Ex. 2, HC 1314-46 (representative sample of Ford's documentation of four months of Ad Sep round "assessments" for Hawkins, consisting of notes such as "unremarkable: no concerns—inmate/patient is doing ok OR No Mental Health Concerns," "Asleep, Respiration observed," and "Lying down acknowledged staff"). Nor did Ford provide some sort of specialized "medical" determination in sending inmates to the mental health clinic for review by a prescriber; housing officers could

---

*Ass'n*, 2010 WL 3791484, at *11 (D. Colo. Sept. 22, 2010); *McCollum*, 2017 WL 608665 at *36.

[37] An inmate so referred might occasionally be seen first by an LPHA intern for information gathering purposes, but only as a prelude to being seen by a prescriber. *Id.* at 72:10-20.

also refer inmates, and in certain circumstances were required to do so. Ex. 13, HC 272; Ex. 27, Martin Dep. 78:6-19. Caselaw excluding "medical treatment decisions" simply does not apply.

Second, even if Ford had made a medical treatment decision, the caselaw does not preclude Plaintiff's claim. The question stems from the "qualified individual" analysis, *see* Part II *supra*, in that "*purely* medical decisions . . . do not *ordinarily* fall within the scope of the ADA or [RA]" because "under either [statute, a plaintiff] is obligated to show that [they] are 'otherwise qualified' for the benefits [they] sought," *see Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (emphases added).[38] This requirement tends to preclude disabled individuals from complaining of the denial of medical care because they frequently qualify for that care *due* to, not *in spite of*, their disability. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005). Here, however, Plaintiff has already established that Hawkins was "otherwise qualified" to receive the benefits of safe housing and adequate monitoring. *See* Part II *supra*. "Medical treatment" caselaw does not apply here.

### 6.    Harris County Failed to Reasonably Accommodate Hawkins by Conducting 25-Minute Observation Rounds Required Under its Own Policy

Defendant further failed to provide Hawkins the observation and monitoring critical to his survival by failing to perform observation rounds as frequently as its own policies required.

Harris County policy required officers to observe all inmates in administrative separation every 25 minutes, and within ten minutes of a shift change. Ex. 13, HC 306. These "rounds" required officers to "[w]alk around, look in [the inmates'] cell[s], and make sure they're okay." Ex. 28, Perkins Dep. 23:1-13; *accord* Ex. 29, Reyes Dep. 35:8-36:6. As already discussed, Reyes and Perkins were on duty until 10:00 p.m. the night Hawkins died. Both claim not to have seen his window covered. Ex. 29, Reyes Dep. 94:9-13; Ex. 28, Perkins Dep. 58:18-59:12. Reyes' last

---

[38] For a discussion of when "medical treatment" decisions are actionable under the ADA and RA, see *McGugan v. Aldana-Bernier*, 752 F.3d 224, 231-32 (2d Cir. 2014).

round was supposedly from 9:07 p.m. to 9:08 p.m., and Perkins claims to have done a round from 9:32 p.m. to 9:33 p.m., followed by the last round prior to Hawkins' death, from 9:52 p.m. to 9:53 p.m. Ex. 29, Reyes Dep. at 94:18-22; Ex. 28, Perkins Dep. 58:11-21; Ex. 6, at HC 6888.

Plaintiff disputes whether that 9:52 p.m. round occurred. Inmates housed in 2J2 with Hawkins at the time of his death testified that although housing officers were expected to do rounds somewhere between every 15 and 30 minutes, they in fact did rounds only every hour or every other hour. *See* Ex. 38, Sowders Dec. ¶4; Ex. 40, Williams Dec. ¶4; Ex. 33, Bartholomew Dec. ¶7. Hawkins would bang on his cell door and yell that he was going to kill himself, but the officers ignored him. Ex. 38, Sowders at ¶15 (noting additionally that Hawkins would talk to himself, saying "we have to do it," then "no we can't do it"); Ex. 40, Williams Dec. ¶¶9-10. In fact, the night of Hawkins' suicide, Everrette Williams remembers that Hawkins had been saying he wanted to kill himself that night, had covered his window, and that Officer Perkins did nothing. *See* Ex. 40, Williams Dec. ¶¶9-10, 12. Williams also remembers that Perkins "was not the type to do his rounds," instead spending time on his phone or flirting with female officers, and that he did not do the 9:52-9:53 p.m. round prior to Hawkins' death. *Id.* at ¶¶11-12.[39]

Plaintiff's expert Mr. Upchurch corroborates these inmates' recollections. He observed that sixteen months of observation logs for the 2J2 cellblock "consistently showed rounds

[39] Hawkins' disabilities and limitations were open, obvious, and apparent to Perkins. First, as just set out in the text, Perkins ignored Hawkins' statements that he wanted to kill himself and ignored the towel over Hawkins' window. Harris County policy mandated that in that situation he (1) generate a psychiatric referral and wait for MHMRA follow up and (2) remove the towel. Ex. 13, HC 272; HC 288-290. Second, while credibility is not generally properly considered at summary judgment, it is clear that Perkins is not credible, and not simply that Plaintiff has produced conflicting evidence. At the time of his deposition he had worked at the Harris County jail for five years, yet claimed to not know or not recall almost a single thing about the experience. *See, e.g.*, Ex. 28, Perkins Dep. 16:6-8 ("I don't know" why inmates might be in Ad Sep); 87:1-88:10 ("I don't remember" in response to (1) When he first heard about Hawkins: this year? A few months ago? When noticed for the deposition?; (2) whether he has ever talked to a supervisor, an investigator, or anyone else about Hawkins' death; (3) whether Hawkins had tried to commit suicide before); 21:21-25 ("I don't remember my partners" between 2012 to 2014; 22:1-14 (remembers Reyes' name but "can't recall" if he ever worked with him); 50:24-51:19 ("I don't remember" as to knowing anything about Hawkins or that Hawkins was found dead in his cell); 53:17-20, ("I don't even remember that day" about February 5, 2014); *but see id.* 58:18-24 (nevertheless insisting Hawkins' window was not covered at any point on February 5, 2014).

29

requiring exactly one minute to perform," which is "generally seen by corrections managers to be an indication of inaccuracy in reporting and documenting." *See* Ex. 39, Upchurch Dec. ¶95; Ex. 6, HC 4663-4804; *id.*, HC 6888-89 (observation log for night of Hawkins' death showing every purported round took exactly one minute). This led him to ask whether "rounds were being accurately documented, if conducted at all." *See id.* at ¶37 ("The towel . . . indicates that any rounds that were occurring may have been improperly conducted."). He suggested that using cameras is the best way to ensure rounds are carried out in high-risk areas like Ad Sep. *Id.* at ¶95. Indeed, Harris County convened a Suicide Prevention Committee Meeting exactly two weeks after Hawkins' death to discuss "other technological options for making security rounds inside Administrative Separation cellblocks . . . instead of paper round sheets." *See* Ex. 12, HC 5738-39; Ex. 31, Upchurch Dep. 67:6-20 ("[O]bviously the suicide review committee had the same issues that I have that make you question the quality of those rounds.").

Finally, records showing that Harris County disciplined Perkins, Reyes, Cano, and others for failing to conduct adequate observations rounds also corroborate the inmates' recollections. On May 31, 2016, Harris County suspended Perkins and two others because six months earlier "[i]nmate [redacted] attempted to hang himself inside of cellblock 2K2 at approximately 6:20 a.m." and "[i]t was discovered that *no* rounds had been conducted in cellblock 2K2 by th[at] time." Ex. 20, HC 7734-36 (emphasis added);[40] Ex. 28, Perkins Dep. 74:18-75:14. Perkins, in particular, was found to have "failed to conduct the last round of night watch[] in cellblocks 2K1 and 2K2." Ex. 20, HC 7736. Perkins blamed his partners for "accidentally writ[ing] the wrong numbers" in the log, Ex. 28, Perkins Dep. 78:23-79:11, but Harris County disciplined all three for failing to conduct their rounds, *id.* at 75:12-14; Ex. 20, HC 7734-7736.

---

[40] Cellblocks 2K1 and 2K2 were administrative cellblocks like 2J1 and 2J2. *See* Ex. 7, at HC 4523.

And in 2015, Harris County disciplined Officers Reyes and Cano, along with about 30 others, for an incident in 2013 in which they allowed an inmate in the 2J1 administrative separation cellblock to live in dangerous, "deplorable conditions" for about a month. *See id.*, HC 7778-90, 9348-61; Ex. 29, Reyes Dep. 72:7-19 (he and "maybe up to 30 jailers" were disciplined and six sergeants were fired). When the Harris County Compliance and Inspection Team arrived on October 9, 2013, they found a month's worth of Styrofoam trays filled with feces, "gnats upon gnats throughout the cell," and that the inmate had destroyed his mattress and used it and his feces to clog the toilet and shower drain. *Id.* at HC 7780-81, 9351-52. During this time period Reyes recorded 48 observation rounds and Cano recorded 410 observation rounds of the 2J1 cellblock. *Id.* at HC 7781, 9352. Reyes stated to the disciplinary review board that he "did not find [the inmate's] cell to be unsanitary," *id.* at HC 7781, while Cano "did not press the matter," allowing the inmate to "remain in unacceptable living conditions," *id.* at HC 9353.

Accordingly, testimony from witnesses with personal knowledge of Ad Sep rounds, and by Officer Perkins in particular; Plaintiff's expert witness' correctional experience; and Officer Reyes', Perkins', Cano's, and others' disciplinary histories all weigh heavily against Defendant's claim that Officer Perkins carried out an observation round from 9:52 p.m. to 9:53 p.m. and that Hawkins' body was hanging for "only" 17 minutes. A jury, resolving all doubts and drawing all inferences in Plaintiff's favor, could find that Harris County failed to follow its own observation policies, thereby enabling Hawkins' suicide.

### 7. Harris County Failed to Reasonably Accommodate Hawkins by Monitoring Him More Closely in 5-10 Minute Rounds

Even if Harris County had actually carried out 25 minute observation rounds, an inmate with Hawkins' history of hearing voices, suicidal statements, and suicide attempts required more.

As Harris County's suicide-prevention consultant Hayes has recognized, even "low risk" inmates (including those with as little as a recent history of self-destructive behavior, and even if they deny suicidal ideation) should be monitored every 10 to 15 minutes given that "[t]he overwhelming majority of suicide attempts in custody are by hanging" and death by hanging often occurs within five to six minutes. Ex. 41, Hayes Rep. at 24. But Hawkins was not a "low risk" inmate; he was an "outlier," "red-zoned" inmate "at constant danger," Ex. 26, Konrad Dep. 214:19-24, with a "history of numerous serious suicide attempts with high intent and high potential for lethality," Ex. 35, Konrad Dec. ¶135. For that reason, Plaintiff's experts identified he needed to be observed in 5-10 minute intervals—to account for the time it would take to die by hanging, plus the time it would take to fashion his bed sheet into a noose and hang himself. Ex. 31, Upchurch Dep. 95:23-96:6; Ex. 39, Upchurch Dec. ¶¶35-36; Ex. 35, Konrad Dec. ¶¶31, 143.3, 145 (5-10 minutes generally, and perhaps constant observation after statement to Ford).

Defendant claims it could not have monitored Hawkins any more frequently than it did because its policies did not allow it. *See, e.g.*, Doc. 194 at 25, 26 & n.178. For example, Defendant asserts that the 5-10 minutes rounds suggested by Upchurch were not possible because "increased monitoring would necessarily occur in the MHU—from which [Hawkins] had been discharged." Doc. 194 at 25. This misses the point. Harris County's choice to have increased monitoring available only if an inmate was admitted to the MHU or otherwise placed on suicide watch was unreasonable and reckless applied to Hawkins. Indeed, Mr. Upchurch testified that "it wouldn't matter to me if it was in the [MHU] or not" so long as he "could get more monitoring, more frequent monitoring" as the result of "a thorough risk assessment to mitigate the risk" posed by the bed sheet and smoke detector. Ex. 31, Upchurch Dep. 93:14-94:3.

In addition, as Defendant's expert Frasier acknowledged, for inmates housed in administrative separation, "if there was some reason for concern, the [housing] officer might think I'm going to check back to that cell more frequently" or "a sergeant could say, you know, I want you to check a particular cell more often." Ex. 24, Frasier Dep. 89:13-25; Ex. 27, Major Martin Dep. 78:6-8, 132:23-24 ("[A]nybody can say . . . I think I need to keep an eye on this inmate because of concerns about potential suicide"; "[e]verybody's responsible for suicide prevention"). And, as Harris County acknowledges, under the Suicide Prevention Plan in effect at the time, housing personnel could be instructed to observe suicidal inmates every 15 minutes. Doc. 194 at 26; Ex. 13, at HC 273 (15-minute observation "is available by MHMRA and deputies")[41]; *see id.*, HC 306 ("PCC personnel"[42] are to be "continually vigilant"). Furthermore, the responsibility of conducting observation rounds was typically split between the two officers on duty. *See* Ex. 22, Cano Dep. 29:22-30:14.[43]

In these circumstances, requiring 5 to 10 minute rounds for a single "outlier" like Hawkins was a "plausible accommodation, the costs of which, facially, d[id] not clearly exceed its benefits." *Val Velzor*, 43 F. Supp. 3d at 752. Harris County has provided no evidence and no argument to support a contention this posed an undue hardship. The Court should allow a jury to decide whether this was a reasonable accommodation Harris County failed to provide.

## C.   Plaintiff's Claims are not Based on Dr. Huerta's "Medical Decision"

Defendant incorrectly charges that Plaintiff's claim challenges Dr. Huerta's "medical decision" to discharge him, five days before his death, from the MHU to the jail's general population, without restrictions on his bedding or clothing. Doc. 194 at 7. Defendant asserts that

---

[41] "[H]ousing personnel . . .working the housing floors" are "either detention officers or deputies." Ex. 30, Summerlin Dep. 29:18-21.
[42] This policy refers to the housing officers on duty in any given pod as "PCC personnel." *See id.*, HC 305.
[43] *Accord* Ex. 28, Perkins Dep. 21:12-16; 32:25-33-10; 56:5-11; Ex. 21, Aguirre Dep. 28:14-29:5.

"Harris County jail officials [were] entitled to rely on the judgment of [a] medical professional," and that Huerta's actions clear Harris County of liability for all its actions or omissions that followed. *Id.* at 13. Defendant's argument must be rejected for three reasons.

First, Plaintiff challenges actions and omissions subsequent to Huerta's release and over which he had no control. Harris County Major Summerlin admitted that jail classification alone determined housing assignments. Ex. 30, Summerlin Dep. 32:25-33:16; 57:15-60:1. Huerta confirmed this; for example, he once attempted to refer an inmate to a particular unit upon discharge from the MHU but learned he had "overstepped on some rules" and was "not supposed to do that." Ex. 25, Huerta Dep. 73:16-74:8. Instead, he could at most "suggest, but not refer" an inmate to "lockdown" as opposed to general population. *Id.* at 97:16-99:3.[44] Classification routinely disregarded these suggestions because MHU staff did not "have access to the [inmate's] classification file" and were "not familiar with [what the] Texas Commission on Jail Standard[s] require[s]." *See* Ex. 30, Summerlin Dep. 57:15-58:1. In fact, Huerta "suggested" Hawkins be transferred to general population upon his release on January 31, 2014, but classification chose to place him in Ad Sep. Ex. 9, HC 4574; Ex. 8, HC 4542.[45] Moreover, it is undisputed that jail staff could have replaced Hawkins' bed sheet with a suicide blanket and could have modified the smoke detector without MHMRA's involvement.

Nor did Huerta have any control over Ford's inaction upon hearing Hawkins' suicidal statement, since she never alerted him or any MHU personnel to it. Ex. 23, Ford Dep. at 112:11-113:16; 119:8-120:11. Finally, Huerta had no control over the quality and quantity of

---

[44] "Lockdown" is another term for Ad Sep. *See, e.g.*, Ex. 29, Reyes Dep. 13:6-16; Ex. 22, Cano Dep. 28:20-25.

[45] Ad Sep is not part of general population. *See, e.g.*, Ex. 30, Summerlin Dep. 55:9-24 (If an inmate has "demonstrated they are unable to be housed in general population . . . then [classification] starts looking at other housing options" like Ad Sep; Ex. 32, Wilson Dep. 50:12-17 (Ad Sep is not considered part of general population).

observation and monitoring provided by housing personnel; he was not involved in custodial operations. Plaintiff's claim does not depend at all on Huerta's decision to discharge Hawkins.

Second, the cases on which Defendant relies are inapposite because Dr. Huerta's decision-making was immaterial to Harris County's choice in housing Hawkins. *See* Doc. 194 at 10-11 (citing *Shelton v. Ark. Dep't of Human Servs.*, 677 F.3d 837 (8th Cir. 2012) and *A.H. v. St. Louis Cty., Mo.*, 891 F.3d 721 (8th Cir. 2018)).

*Shelton* involved a suicide in a State Hospital, not a correctional institution. *See Shelton*, 677 F.3d at 839. The decedent voluntarily admitted herself to suicide watch, but the treating physician later ordered her removed. *Id.* She then hanged herself. *Id.* The Eighth Circuit found it significant that the doctor was the sole decision-maker in this process and that there "was no allegation that the decision . . . was influenced by anything other than a physician's judgment." *See id.* at 839 n.2, 843. Unlike the physician in *Shelton*, Huerta simply did not—indeed could not—determine Hawkins' housing assignment.

In *A.H.*, which involved a jail suicide, the jail had a policy allowing clinical psychologists to place potentially suicidal inmates on "precautionary status" when discharging them from the infirmary. *A.H.*, 891 F.3d at 725. Jail personnel were then required to house those inmates in general population with a cellmate and to observe those inmates at a greater frequency than normally expected. *Id.* Despite being placed on "precautionary status" upon discharge from the infirmary, however, the decedent in *A.H.* hanged himself in between rounds and while his cellmate was absent. *Id.* Thus, in *A.H.*, the plaintiff challenged the psychologist's decision to place the decedent on "precautionary status," since it directly led to the monitoring and housing which later proved inadequate. *See id.* In comparison, Dr. Huerta had no power to instruct jail classification officers on what type of cell or monitoring to assign Hawkins.

The statements in *A.H.* and *Shelton* that inadequate medical treatment decisions are not cognizable under the ADA came from *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam). *Burger* is a one-page opinion adopting the reasoning in *Schiavo*, 403 F.3d 1289, 1294, and *Fitzgerald*, 403 F.3d 1134, 1144, that a disabled plaintiff generally cannot complain of medical treatment they were not otherwise qualified to receive. *See* Part III.B.5 *supra*. But this aspect of *A.H.* and *Shelton* is meaningful only because the medical decision-maker in each was the proximate cause of the housing and monitoring that led to the decedents' deaths.[46]

Here, Dr. Huerta played no role in Harris County's decision-making process as to where and how to house or monitor Hawkins. His discharge order "was not, in the general tort sense, a legal or proximate cause." *See Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 560 n.16 (5th Cir 1998) ("[F]amiliar tort principles such as proximate cause" apply in ADA context. (citation omitted)); *see also Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) ("[W]e have never held that mere 'but-for' causation is sufficient under the ADA.").

Third, the Court should reject Defendant's claim that "Harris County jail officials [were] entitled to rely on the judgment of medical professionals." Doc. 194 at 13. The cases upon which Defendant relies involved claims under the Eighth Amendment, which unlike the ADA requires showing that individuals acting under color of state law displayed *subjective deliberate indifference* to a substantial risk of serious harm. *See* Doc. 194 at 13 & n.89. In contrast, there is

---

[46] Defendant quoted *Shelton* for the propositions that the Eighth Circuit has "generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment" and "[o]nce one is classified as a suicide risk, the right to be protected from that risk would seem to fall under the ambit of the right to have medical needs addressed." Doc. 194 at 9-10; *Shelton*, 677 F.3d at 843. Both of these quotes were contained in parenthetical form in *Shelton*; the first came from *Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 905 (8th Cir. 2001), and the second from *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998). *See Shelton*, 677 F.3d at 843. The Eighth Circuit quoted these two cases for the exact *opposite* reason as their use by Defendant: to illustrate that while the Eighth Circuit had never held that a decision to remove a patient from suicide watch "must be deemed a medical treatment decision" under the ADA, it *has* "characterized the decision as such for other purposes," *id.* at 843, namely in the significantly different context of deciding that deliberate indifference to an inmate's risk of suicide falls under the heading of deliberate indifference to medical needs for purposes of the Eighth Amendment. *See id.*

no *mens rea* requirement under the ADA; if an "accommodation is in fact reasonable" it is "therefore required" and "the defendants are liable simply by denying it." *Bennett-Nelson*, 431 F.3d at 455.[47] Any reliance on Huerta's decision plays no part in making out Plaintiff's claim.

**IV.   Whether Harris County "Intentionally" Discriminated is a Question for the Jury**

To recover compensatory damages, Plaintiff must show that Harris County's discrimination was intentional. *See Delano-Pyle*, 302 F.3d at 574. Plaintiff has presented sufficient evidence on the issue and it should go to the jury.

The Fifth Circuit has repeatedly declined to define "intent" for purposes of the ADA and RA. *See, e.g.*, *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) ("[W]e have previously declined to adopt a specific standard of intent. . . . [w]e need not delineate the precise contours in this case."). It has, however, affirmed a jury award of compensatory damages in a failure to accommodate case, in the absence of any showing of malice or willfulness. *Delano-Pyle*, 302 F.3d at 571, 75-76. In *Delano-Pyle*, a hearing-impaired plaintiff challenged a police officer's actions in interrogating him and administering sobriety tests without any reasonable accommodations for his impairment. *Id*. On review, the Fifth Circuit noted that the officer knew of the plaintiff's hearing disability and knew that the plaintiff did not understand him, yet repeatedly communicated without any accommodations, and without assuring the plaintiff understood his *Miranda* rights. *Id*. Under these facts—without any showing of malice—the court upheld the jury's conclusion that the officer's conduct constituted intentional discrimination. *Id*. Similarly, the Fifth Circuit reversed summary judgment where the record created a dispute of material fact on the issue of whether a hospital's failure to accommodate the plaintiffs' known hearing disabilities was intentional. *Perez v. Doctors Hosp.*

---

[47] *Accord Punt v. Kelly Services*, 862 F.3d 1040, 1048 (10th Cir. 2017) ("There is at least one type of ADA claim, however, which does not require any evidence of discriminatory intent, whether direct or circumstantial: a failure-to-accommodate claim."); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003).

*at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015). In support, the court noted repeated instances of the denial of requested hearing interpreters, as well as defendant's knowledge that an auxiliary device in use was proving ineffective. *Id.*

"Intent is usually shown only by inferences. Inferences are for a fact-finder and [a court is] not that." *Id*. Plaintiff has submitted evidence that Harris County's agents "ignored clear indications" that Hawkins had a limiting disability and needed accommodations. *See id.* at 185. Moreover, Plaintiff's experts have opined that Harris County's other, related practices evidence Defendant's clear disregard for effective suicide prevention and intervention. Ex. 39, Upchurch Dec. ¶¶37, 95 (accuracy and veracity of observational rounds logs); ¶¶38-41, 96 (cut-down tool and post-suicide intervention methods), ¶¶97-98 (communication between MHU and classification staff), ¶¶100-102 (T-cards to alert to suicidality); Ex. 35, Konrad Dec. ¶¶138-141 (use of Ad Sep for suicidal inmates); ¶¶ 148-154 (increased communication between correctional and health staff). Defendant's consultant Hayes made several similar recommendations. Ex. 41, Hayes Rep. 22-24 (housing practices); 31-34 (observation practices); 40-44 (all recommendations). Weighing all this evidence, a reasonable jury could find in Plaintiff's favor on the question of intentional discrimination, and summary judgment is not warranted.

## V.    Each of Harris County's Actions Above Also Was Intentional Discrimination

For the same reasons set out above with regard to Defendant's intentional failure to accommodate Hawkins' open, obvious, and apparent limitations, *see* Part III.B *supra*, Harris County also intentionally discriminated against him by denying him the benefits of safe housing and adequate monitoring, to which all inmates are entitled. *Melton*, 391 F.3d at 671.[48]

---

[48] A showing of intentional discrimination by exclusion from or denial of essential benefits is a separate theory from a claim of failure to make reasonable accommodation. *See, e.g.*, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) ("To establish discrimination under . . . the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable

First, every inmate is entitled to the benefits of safe confinement, which include safe housing and adequate monitoring to protect them from harm, including suicide. Ex. 27, Martin Dep. 20:13-21:23; 132:17-24; *Wright*, 2013 WL 6578994, at *3-4; *Hinojosa*, 994 F. Supp. 2d at 844; *McCollum* 2017 WL 608665, at *38; Part II.A, *supra*. Second, each of Harris County's actions described above, Part III.B.2-7, shows discrimination against Hawkins, that is, deprivation of safe housing or adequate monitoring because of Defendant's failure to account for his disabilities, *id.* Third, the discrimination was "by reason of his disability," *Melton*, 391 F.3d at 671: it was caused by knowledge of his disability and needs, combined with deliberate failure to make any responsive changes. *Id.* The Fifth Circuit does not require animus or malice for a showing of discrimination by denial of essential services. *Delano-Pyle*, 302 F.3d at 575; *Perez*, 624 F. App'x at 184-85. Plaintiff's claim of discrimination by denial of essential benefits of safe confinement should be allowed to proceed to trial.

## VI. The Court Should Deny Defendant's Motion as to Plaintiff's RA Claims

The RA applies (1) to "program[s] or activit[ies] receiving Federal assistance," and (2) prohibits those entities from discriminating "solely" on the basis of disability. 29 U.S.C. § 794(a). Defendant asserts Plaintiff can show neither requirement. This is incorrect.

First, Defendant argues that because it does not receive federal funding "for the mental health unit or any program or activity related to housing [or] monitoring," discrimination in those programs is not subject to the RA. Doc. 194 at 31-32. However, "program or activity" under the RA means "all of the operations" of "a department, agency . . . or other instrumentality of a State or of a local government." 29 U.S.C. § 701(b)(1)(A). Accordingly, "[o]nce [a] department or agency is identified . . . the statute encompasses all of its operations, regardless of whether [any]

---

accommodation."); *accord J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1297 (10th Cir. 2016).

particular operation is federally assisted." *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 200 (3d Cir. 2008); *see Frame*, 657 F.3d at 227.[49]

Here, the "department or agency" of the "local government" under which operations the Harris County jail falls is the Harris County Sheriff's Office ("HCSO"). *See* Tex. Local Gov. Code 351.041(a); Doc. 194 at 32 & n.219, Def. Ex. 39 (listing sources of federal funding for Harris County jail, all under the HCSO). Because HCSO receives millions in federal funding, *all* of its operations—including the programs of which Plaintiff complains—are subject to the RA. And because "Texas law does not allow county or municipal police departments to sue or be sued directly," allegations of HCSO misconduct must be directed against Harris County. *See, e.g.*, *Potts v. Crosby Indep. Sch. Dist.*, 2005 WL 1527657, at *6 (S.D. Tex. June 28, 2005).

Second, Defendant contends Hawkins was not discriminated against "*solely* by reason of his disability." Doc. 194 at 32. Defendant misinterprets the RA's requirements. As the Fifth Circuit has explained, this requirement is "immaterial" because any claim of being excluded as a result of a failure to accommodate is limited "precisely to the extent that [the plaintiffs] were not accommodated." *See Bennett-Nelson*, 431 F.3d at 454-55. Plaintiff's analyses of her ADA claims therefore apply to her RA claims.

## VII.  Conclusion and Relief Sought

Plaintiff has shown genuine issues of material fact in dispute on her ADA and RA claims. Therefore, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment, Doc. 194, in all respects, and allow the case to proceed to trial.

---

[49] For example, in *Thomlinson v. City of Omaha*, 63 F.3d 786, 788-89 (8th Cir. 1995), the Eighth Circuit upheld a jury verdict against the City of Omaha on the basis that the city's Fire Division had discriminated against the plaintiff in violation of the RA. The Fire Division was one of several subdivisions within the city's Public Safety Department. *Id.* at 789. While the Fire Division itself did not receive federal funding, other subdivisions did. *Id.* This meant the entire Department—including the Fire Division—was subject to the RA. *Id.*

Date: October 16, 2018.

Respectfully submitted,

/s/ *Natalia Cornelio*
Natalia Cornelio
Illinois Bar No. 6289267
Southern District No. 1278866
TEXAS CIVIL RIGHTS PROJECT
405 Main St, Suite 716
Houston, Texas 77002
Tel: (832) 767-3650
Fax: (832) 554-9981
natalia@texascivilrightsproject.org

Ranjana Natarajan
Texas Bar No. 24071013
Southern District No. 2147709.
THE UNIVERSITY OF TEXAS SCHOOL
OF LAW
Civil Rights Clinic
727 E. Dean Keeton St.
Austin, TX 78705
Tel: (512) 232-7222
Fax: (512) 232-0800
rnatarajan@law.utexas.edu

Thomas M. Gutting
State Bar No. 24067640
S. Dist. No. 24067640
KING & SPALDING LLP
1100 Louisiana, suite 4000
Houston, Texas 77002
(713) 276-7358
tgutting@kslaw.com
bzubay@kslaw.com

*Attorneys for Plaintiff Jacqueline Smith In
Her Capacity as Executor of the Estate of
Danarian Hawkins, Deceased.*

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record on October 16, 2018, through the Electronic Case File System of the Southern District of Texas.

*/s/ Natalia Cornelio*